[Cite as *State v. Zimmerman*, 2019-Ohio-721.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,              :

                                          No. 18AP-75

v.                                                :       (C.P.C. No. 17CR-826)

Edwin E. Zimmerman,                         :       (REGULAR CALENDAR)

      Defendant-Appellant.          :

---

D E C I S I O N

Rendered on February 28, 2019

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee. **Argued:** *Valerie B. Swanson.*

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant. **Argued:** *Robert D. Essex.*

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1}   Defendant-appellant, Edwin E. Zimmerman, appeals a judgment of the Franklin County Court of Common Pleas entered on January 9, 2018, sentencing him to serve 11 years in prison for the crime of kidnapping.  We find that the jury foreperson's admission that she saw excluded prejudicial evidence and relayed what she saw to the other jurors at the outset of deliberations, combined with the fact that police officer witnesses offered hearsay testimony and improperly vouched for the credibility of the victim, deprived Zimmerman of a fair trial.  We reverse and remand the case for a new trial.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   On February 9, 2017, a Franklin County Grand Jury indicted Zimmerman for a single count of kidnapping.  (Feb. 9, 2017 Indictment.)  Zimmerman pled "not guilty" and his case was tried before a jury.  (Feb. 13, 2017 Plea Form.)  Trial began on October 2, 2017 with testimony by the victim, Ashley Ward.

{¶ 3} Ward testified that at the time of the alleged offense she was severely addicted to heroin and had been using pills or heroin (and sometimes crack cocaine) since 2003. (Tr. at 59-60, 63-64, 71.)[1] She admitted that she had resorted to prostitution to help pay for her drug habit; she walked streets near Parsons Avenue. (Tr. at 34.) At the time of the incident, she was spending up to $400 per day on drugs though she only made $100 to $200 per day as a prostitute. (Tr. at 83-84.) She acknowledged heroin dulled her senses, she sometimes would lose time while on a "bender," and she sometimes would become quite desperate for drugs. (Tr. at 65-69.) She also admitted she had used heroin within hours of the offense but stated she had come down and needed another dose at the time when she encountered Zimmerman. (Tr. at 95-96.)

{¶ 4} She said Zimmerman picked her up in his white minivan shortly after midnight on January 1, 2017 by offering her $300 for two hours of her time. (Tr. at 71-72.) Since she sometimes charged as little as $60 for sexual intercourse, $300 was a good offer, so she accepted and got in the vehicle. (Tr. at 69-72.) She testified that she was under the impression that he was going to take her to his nearby house. (Tr. at 41-42, 91-92.) When Zimmerman had been driving for a time, she told him she wanted to stop and get her "stuff" if they were going to go so far away, but he said he had "stuff" at his house. (Tr. at 42-43.) By "stuff" she testified she meant heroin. *Id.*

{¶ 5} Her testimony about what happened next varied somewhat between her testimony on direct and cross-examination. As she rode in Zimmerman's van, she said the conversation turned to prostitutes who had been found dead in a cornfield. (Tr. at 42-43) On direct examination, she described Zimmerman as mocking when he discussed whether the authorities had found out who did it. (Tr. at 43.) On cross-examination, she denied that Zimmerman was ever mean, menacing, or angry during the drive and testified she could not remember who brought up the topic. (Tr. at 94-97, 114.) The drive ended when Zimmerman pulled into a cornfield; Ward told him she was not comfortable with the location given about what they had been talking. (Tr. at 42-46.) Zimmerman indicated that it would all be over soon. (Tr. at 46.) Ward initially testified she interpreted this

---

[1] The transcript of the trial and sentencing in this case was filed on March 13, 2018 in two consecutively paginated volumes. For citation simplicity and because the volumes are consecutively paginated, we cite only to the page referenced.

exchange as being an indication that Zimmerman intended to kill her but then later agreed it was an attempt to comfort her. (Tr. at 46, 99-100.)

{¶ 6} When Ward indicated she thought they were going to go to a house, Zimmerman said they were actually just going to stay in the van. (Tr. at 47.) He then told her to get in the back of the van. (Tr. at 48.) When she refused, he pulled a folding pocketknife from the side panel in the door of his van with its three-inch blade deployed. (Tr. at 48-49.) He repeatedly sliced the air near her face and again told her to get in the back seat. (Tr. at 48-49, 116.) At that point, she got out of the van, and wrote the license number down on her sleeve while Zimmerman drove away. (Tr. at 49-51.) On direct examination Ward testified that as she got out of the van Zimmerman grabbed for her but missed because he was restrained by his seatbelt. (Tr. at 49-50.) However, on cross-examination she admitted the van had power locks but Zimmerman did not try to lock her in and he made no attempt to chase her when she ran away. (Tr. at 97-98.) She also said she could have gotten out of the van at any time and (in conflict with her other testimony) testified she had no issues in getting out of the vehicle. (Tr. at 98, 107, 111.) She also admitted she had seen Zimmerman in the neighborhood since the event and he had never bothered her. (Tr. at 50, 90.)

{¶ 7} Ward explained she obtained a ride back to Parsons Avenue by knocking on the door of a neighboring house and asking the person there for a ride. (Tr. at 51-52.) She did not contact the police at that point in time and instead got high. (Tr. at 118-20.) She was unable to relate where the area was or from which house she had obtained a ride. (Tr. at 92-93.) She attributed the lack of recall to a brain injury sustained as the result of an auto accident when she was a child. *Id.* She said she only told the police about Zimmerman when, approximately two weeks later, the police questioned her in connection with an investigation unrelated to Zimmerman. (Tr. at 118-20.) She admitted she was upset that Zimmerman did not pay her. *Id.*

{¶ 8} The next witness to testify was a patrol officer who generally worked the neighborhood in which Ward operated. (Tr. at 133-34.) He testified he knew Ward and could tell by her precipitously declining appearance that she was an addict. (Tr. at 135.) But he testified he nonetheless had found her to be "honest" about anything he asked her. *Id.* He testified Ward told him her story and he passed along the information she gave him

to detectives with the Columbus Division of Police.  (Tr. at 159.)  The officer was permitted, over the objection of the defense, to recount much of the substance of what Ward told him, largely repeating the narrative Ward offered before the trial court cut off his testimony as improper hearsay.  (Tr. at 136-38.)  Though the prosecutor initially insisted that the material was not being offered for the truth of the matters asserted, shortly thereafter, the prosecutor indicated the officer's testimony was intended to improve Ward's credibility. (Tr. at 136-38, 140.)

{¶ 9}  Another patrol officer, a Community Response Team ("CRT") officer, also testified he knew many of the prostitutes who operated in Ward's area.  (Tr. at 167-69.) Although he did not know Ward well, at the request of officers from Fairfield County investigating another crime, he made contact with Ward, thereby connecting her with the police and setting in motion the events that led to Zimmerman.  (Tr. at 170-72.)  Although the officer admitted he did not know Ward, he was permitted, over a defense objection, to testify that he "believe[d] her."  (Tr. at 173-74.)

{¶ 10}  The final two witnesses were a crime scene search detective and a forensic science expert.  These witnesses confirmed that Zimmerman drove a white minivan with the same license number written down by Ward and, according to cellular phone data, was in the area of Parsons Avenue on New Year's Eve 2016.  *See* State's Ex. B; State's Exs. C2-C7; Tr. at 139-40, 187.  One of the items found in the van and photographed by the crime scene search detective was a knife.  (Tr. at 128-30, 195-96, 232-33.)  Because the knife evidently did not match the description given by Ward, the trial court concluded that the photograph was prejudicial and misleading rather than probative.  (Tr. at 128-30, 195-96.) It therefore excluded the photograph (which had been marked, State's Exhibit C22) from evidence and that photograph was never intentionally shown to the jury or admitted into evidence.  (Tr. at 195-96, 232-33.)

{¶ 11}  In opening and closing statements, Zimmerman's attorneys did not contest that Zimmerman picked up Ward on January 1, 2017 in order to pay her for sex, or that he drove her to a remote spot in order to complete that transaction.  (Tr. at 27-30, 245-48.) However, counsel argued Ward was behaving erratically and when she became spooked by her conversation with Zimmerman about missing prostitutes, she ran away once Zimmerman parked his van in a cornfield. *Id.* Zimmerman's attorneys argued Zimmerman

never pulled a knife and noted that, by Ward's own admission, she could have left the vehicle at any time and Zimmerman made no attempt to stop or give chase (even though he was in a vehicle and she was on foot). *Id.*

{¶ 12} On October 3, 2017, the jury found Zimmerman guilty of kidnapping. (Oct. 3, 2017 Verdict Form; Tr. at 267-68.) Following the verdict, in discussions with counsel, one of the jurors inquired about where the knife was found and indicated that she had seen a picture of it on the prosecutor's laptop. (Oct. 11, 2017 Hearing Tr. at 2, filed Mar. 13, 2018; Oct. 12, 2017 Mot. for New Trial at 2.) The trial court held a hearing on the subject. The juror (who had served as the foreperson of the jury) said that she saw the photograph on the prosecutor's laptop and that she communicated that fact to the other jurors "early on" in the deliberations before anyone "said anything." (Oct. 11, 2017 Hearing Tr. at 6-7.) After questioning about whether it affected her verdict, the foreperson claimed there had been no effect, that the jury had been focused on the evidence provided, and that she did not think the other jurors believed her revelation about the knife. *Id.* at 6-8.

{¶ 13} Despite having accepted the foreperson's answers, in the trial court's decision on Zimmerman's motion for a new trial, the court found that the foreperson's statements were inadmissible. The trial court reasoned that because the jury's exposure to prejudicial excluded evidence was not revealed by "outside evidence," it did not satisfy Ohio Rule of Evidence 606(B). (Nov. 16, 2017 Decision at 4-7.) Thus, asking the foreperson to speak on the topic of deliberations had been inappropriate. *Id.* The trial court further found that even if the foreperson's statements could have been considered, the knife was not "devastating" evidence and there was no reasonable possibility that the jury had considered the knife such that it "contributed" to Zimmerman's conviction. *Id.* at 7.

{¶ 14} On January 4, 2018, the trial court convened a sentencing hearing. (Tr. at 270.) Based on the fact that Zimmerman was on probation when he committed the offense and that he had a poor criminal record (which included several sex crimes similar in nature to that of which he was accused in this case), the trial court sentenced him to the maximum sentence of 11 years. (Tr. at 281-85.)

{¶ 15} Zimmerman now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Zimmerman assigns six errors for our review:

[1.] Appellant was denied his due process right to a fair trial when the court failed to grant him a new trial based on the jury learning of a photograph of a knife which was not introduced into evidence nor used in the crime and which was highly prejudicial to the appellant.

[2.] The trial court erred to the prejudice of the appellant in permitting numerous instances of the state improperly bolstering its main witness' credibility via other witnesses.

[3.] The appellant was denied the effective assistance of counsel based on numerous instances of failure to object to improper and highly prejudicial testimony.

[4.] The numerous instances [of] improper and prejudicial testimony in addition to the jury's knowledge of the knife that was not introduced into evidence rise to the level of cumulative error.

[5.] Appellant's kidnapping conviction was not supported by sufficient evidence.

[6.] Appellant's kidnapping conviction was against the manifest weight of the evidence.

## III.  DISCUSSION

### A.  First Assignment of Error – Whether the Trial Court Erred in Failing to Grant Zimmerman a New Trial Based on the Revelation that the Jury was Exposed to Excluded Evidence the Court had Already Ruled was Prejudicial

#### 1.  Whether Consideration of the Juror's Testimony was Proper

{¶ 17} Ohio Rule of Evidence 606(B) provides:

**Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. *A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention* or whether any outside influence was improperly brought to bear on any juror, *only after some*

> *outside evidence of that act or event has been presented.* <u>However a juror may testify without the presentation of any outside evidence concerning</u> any threat, any bribe, any attempted threat or bribe, or <u>any improprieties of any officer of the court.</u> A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received for these purposes.

(Emphasis sic and added.)  The trial court concluded that the juror testimony should not have been considered because no "outside evidence" had been submitted pointing to the fact that "extraneous prejudicial information was improperly brought to the jury's attention." *Id.*; *see also* Nov. 16, 2017 Decision & Entry at 4-7.

{¶ 18} But "a juror may testify without the presentation of any outside evidence concerning any * * * improprieties of any officer of the court." Evid.R. 606(B).  The Oxford English Dictionary defines "impropriety," in relevant part as, "[w]ant of accordance with * * * reason or rule; incorrectness, erroneousness, inaccuracy."  Oxford English Dictionary (Online Ed.July 2018).  The Supreme Court of Ohio has found impropriety where, for example, a bailiff erroneously informed a jury that they were not permitted to fail to reach a verdict.  *State v. Adams*, 141 Ohio St. 423 (1943); *see also* Evid.R. 606(B) (staff notes citing *Adams* and stating "the aliunde rule does not apply where the irregularity is due to the conduct of an officer of the court").[2]  There is nothing to suggest in this case that the prosecutor intentionally or maliciously showed the juror the excluded evidence, yet it was surely "erroneous" or an "impropriety" to have displayed the excluded photograph in a position in which it could have been (and was) observed by a member of the jury who admitted that she told the other jurors what she had seen.

{¶ 19} Thus, we agree with the trial court's original decision to permit the foreperson to give a statement concerning the impact of the accidental impropriety under Evid.R. 606(B).  We do not agree with the trial court's later decision to retroactively exclude the statement it elicited.  We therefore approach the question of whether the trial court erred in denying Zimmerman's motion for a new trial in consideration of the foreperson's statements.

---

[2] *But cf. State v. Spurlock*, 2d Dist. No. 17954, 2000 WL 1433936, 2000 Ohio App. LEXIS 4490, *9-10 (Sept. 29, 2000) (using the Latin maxim noscitur a sociis to infuse the definition of "improprieties" with an association of threats and bribes).

### 2. Whether the Trial Court Erred in Refusing to Grant Zimmerman a New Trial

{¶ 20} Ohio Rule of Criminal Procedure 33 provides:

> **(A) Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
>
> (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
>
> * * *
>
> **(E) Invalid grounds for new trial.** No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:
>
> * * *
>
> (5) Any other cause, unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial.

(Emphasis sic.) Crim.R. 33(A)(1) and (E)(5).

{¶ 21} We review a trial court's decision on a motion for a new trial for abuse of discretion. *State v. Meek*, 10th Dist. No. 16AP-549, 2017-Ohio-9258, ¶ 23. A trial court's decision constitutes an abuse of discretion when it is, among other things, "unreasonable." *Id.,* citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). It is also error, even under an abuse of discretion standard, for a trial court to err legally because " 'no court has the authority, within its discretion, to commit an error of law.' " *JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7; *see also, e.g.*, *State v. Chandler*, 10th Dist. No. 13AP-452, 2013-Ohio-4671, ¶ 8 (Citations omitted.) ("Although an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, we note that no court has the authority, within its discretion, to commit an error of law.").

{¶ 22} In this case, the trial court excluded the picture of the knife because it found it was "prejudicial" and that the prejudice of showing it to the jury "certainly outweigh[ed] the probative value." (Tr. at 195-96.) Then, after the verdict, the jury foreperson revealed that, she had seen the knife picture on the prosecutor's laptop and, "early" in deliberations,

before anyone had even "said anything," she had informed her fellow jurors. (Oct. 11, 2017 Hearing Tr. at 6-7.) Notwithstanding the fact that the trial court had originally concluded that the picture of the knife was "prejudicial" and that the prejudice created by the jury seeing it would "certainly outweigh[] [any] probative value," the trial court denied the motion for a new trial because Zimmerman had failed to prove prejudice. (Nov. 16, 2017 Decision at 7.) Specifically, he had failed to prove that the knife picture "contributed to [his] conviction" or was "devastating" such that the jurors would have ignored the general instruction to confine their consideration of the case to the evidence presented. *Id.*

{¶ 23} Yet, Zimmerman was not required to prove that the knife picture was "devastating" or that it "contributed to [his] conviction." (Nov. 16, 2017 Decision at 7.) The law only required Zimmerman to show an "irregularity in the proceedings" and that he "was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(A)(1) and (E)(5). The jury foreperson admitted an irregularity occurred when she saw the picture and told the other jurors about it before they began their deliberations. (Oct. 11, 2017 Hearing Tr. at 6-7.) And the trial court itself had excluded the knife picture on the grounds that, if the jury were to see it, it would cause unfair prejudice to Zimmerman. (Tr. at 195-96.) As this was a single-witness case where the sole victim-witness' testimony suffered from a number of inconsistencies and she admitted a number of impairing conditions, the prejudice posed by the knife is enhanced to the point where it begins to imbue doubt in the outcome. *See supra* at ¶ 5-7; *see post* at ¶ 33-34.

{¶ 24} The plaintiff-appellee, State of Ohio, argues that Zimmerman never overcame the presumption that the jury followed the court's instructions and confined itself to deliberating based solely on the evidence introduced at trial because Zimmerman never showed that the knife picture was "devastating." (State's Brief at 19-20, citing *Green v. Miller*, 483 U.S. 756, 767, fn. 8 (1987.) In other words, the State argues that since the jury is presumed to follow the trial court's instructions and since there was no showing that the knife was too "devastating" for the jury to ignore, we cannot infer that the jury violated the court's instruction to consider only properly admitted evidence.

{¶ 25} However, we need not *infer* anything where there is direct evidence. The presumption that the jury obeyed the trial court's instructions was compromised the moment the jury foreperson admitted she saw the knife picture and immediately related

what she saw to her fellow jurors before anyone else even had a chance to say anything at the outset of deliberations.  (Oct. 11, 2017 Hearing Tr. at 6-7.)  It is true that, after that admission, the foreperson claimed that the picture did not change the result of her deliberation and claimed she found it unlikely that any of her fellow jurors even believed her.  *Id.* at 6-8.  But if it was apparently not inconsequential to the foreperson; otherwise, it seems unlikely she would mention the knife at all to anyone.  The fact that she felt the need to tell her fellow jurors about it at the outset of deliberations and then immediately question the attorneys about it after the verdict suggests its importance to her at the time of the verdict than perhaps in later retrospect.[3]  Moreover, her statement that her fellow jurors did not believe her is not something she was in a position to know, and that speculation is rendered even more unlikely by her trusted status as elected foreperson of the jury.

{¶ 26}  By requiring proofs from Zimmerman in excess of what is required by law for supporting a motion for a new trial, and by concluding that no prejudice had been shown despite having already found that introducing the knife picture would have been prejudicial, the trial court acted unreasonably.  Under the circumstances, it abused its discretion in denying Zimmerman's motion for a new trial.  Zimmerman's first assignment of error is sustained.

### B. Second Assignment of Error – Whether the Trial Court Erred in Permitting Bolstering of Ward's Credibility by Officer Witnesses

{¶ 27}  "Generally, '[t]he admission of evidence is within the discretion of the trial court.' "  *Shaw v. Underwood*, 10th Dist. No. 16AP-605, 2017-Ohio-845, ¶ 25, quoting *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 36, citing *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38.  Thus, the decision to admit or exclude evidence is reviewed for abuse of discretion.  *Underwood* at ¶ 25.  But, even in the context of evidentiary questions, "no court has the authority, within its discretion, to commit an error of law."  *Liggins* at ¶ 18.  Zimmerman argues that three exchanges with two of the officer-witnesses at trial amounted to the officers improperly bolstering Ward's credibility and should not have been permitted by the trial court.

---

[3] By the time she minimized the impact of her statements to the jury, she perhaps may have begun to suspect that she erred in failing to follow the trial court's instructions.  (Oct. 11, 2017 Hearing Tr. at 5, 7) (trial court twice reassured the foreperson that there were no "right or wrong answers" and that she was not in "trouble" in order to elicit statements from her).)

(Zimmerman Brief at 19-30.)   We address these in the order they are alleged to have occurred at trial.

{¶ 28}  First, an officer testified that he knew Ward and had found her to be "honest" about anything he asked her.  (Tr. at 135.)  Specifically, he testified as follows:

> Q.  Did you get to know her?
>
> A.  Yes. We talked to her frequently. Actually, she was one of the nicer girls. She was always willing to help us out. If we had a question, she would always be honest with us about what we were asking. Whenever we saw her, we would usually stop and have a chat with her.

*Id.* Because Zimmerman did not object when this testimony was offered, we review its admission for plain error.  *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 29}  This testimony could be considered evidence of Ward's character for truthfulness.  Ohio Rule of Evidence 608(A) controls the admissibility of such testimony:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

We note that Ward's character for truthfulness was put in issue by the defense during argument, but was not attacked through evidence.  This Court has held "[v]igorous cross-examination or opening statements do not constitute the type of attack upon a witness' character for truthfulness envisioned by Evid.R. 608(A)(2)." *State v. Ponce*, 10th Dist. No. 95APA11-1450, 1996 WL 589267, 1996 Ohio App. LEXIS 4552, *19 (Oct. 10, 1996), citing *United States v. Thomas*, 768 F.2d 611, 618 (5th Cir.1985); *United States v. Danehy*, 680 F.2d 1311, 1314 (11th Cir.1982); *Beard v. Mitchell*, 604 F.2d 485 (7th Cir.1979).  Although the defense in this case certainly argued that the jury should not believe Ward based on Ward's sometimes self-contradictory testimony, her personal choices, and her admitted impairments, it is a close question as to whether the defense "attacked" her "truthfulness" for Evid.R. 608(A) to apply.  Because it is a close question, the admission of this testimony without objection is not an " 'obvious defect' " in the proceedings and hence is not "plain error." *Rogers* at ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 30}  The second incident Zimmerman challenges was one in which an officer was permitted, over the objection of the defense, to recount much of the substance of what Ward told him, largely repeating the narrative Ward offered before the trial court cut off his testimony as improper hearsay.  (Tr. at 136-38.)  Though the prosecutor initially insisted that the material was not being offered for the truth of the matters asserted, shortly thereafter, the prosecutor indicated the officer's testimony, repeating what Ward told him, was intended to improve Ward's credibility.  (Tr. at 136-38, 140.)

{¶ 31}  The State has sought to justify the admission of this testimony for the purpose of showing the basis on which and how the officer's investigation proceeded and not for the truth, arguing that the trial court's instruction to the jury cured any confusion related to it. (State Brief at 28.)  However the officer's "investigation" consisted of taking down Ward's statement and delivering it to detectives at headquarters.  (Tr. at 159.)  Nothing other than the fact that Ward gave the officer a statement about an alleged crime is necessary to establish for the jury the course of that limited "investigation."  This purpose did not supply a need for the officer to recount the substance of any of what Ward told him and the only conceivable purpose of that testimony was to suggest the truth of Ward's statements by showing that she had told the same story before.  (Tr. at 136-37.)  The trial court then reversed course and sustained the objection.  *Id.*; Evid.R. 801(C); Evid.R. 802. But this happened only after the officer had repeated much of Ward's narrative and, despite the State's arguments, the trial court did not instruct the jury to disregard the improper testimony, but rather, allowed further (albeit more limited) commentary by the officer on direct examination about what Ward had said.  (Tr. at 137-40.)  This was error.

{¶ 32} The final incident Zimmerman raises was an instance in which a different officer admitted he did not know Ward but he was nonetheless permitted, over defense objection, to testify that she told him her story and he "believe[d] her."  (Tr. at 173-74.) Notwithstanding Evid.R. 608, testimony that a particular witness is telling the truth about something in particular infringes on the role of the factfinder and is " 'egregious [and] prejudicial.' "  *State v. Allen*, 8th Dist. No. 92482, 2010-Ohio-9, ¶ 45-50, quoting *State v. Boston*, 46 Ohio St.3d 108, 128-29 (1989); *see also State v. Eastham*, 39 Ohio St.3d 307, 312 (1988).  The jury—not any witness, officer, or expert—is the arbiter of credibility in a criminal trial and it was for the jury to decide if it was going to "believe" Ward or not.  *See*

*e.g.*, *State v. Smith*, 10th Dist. No. 16AP-21, 2017-Ohio-9283, ¶ 46, 48-50.  Overruling the defense objection to this testimony was error.

{¶ 33}  Zimmerman's second assignment of error is sustained in part and overruled in part.

### C.  Fourth Assignment of Error – Cumulative Effect

{¶ 34}  As his fourth assignment of error, Zimmerman argues that the cumulative effect of the errors he has raised resulted in denying him a fair trial.  (Zimmerman Brief at 38-39.)  "Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error." *State v. McClurkin*, 10th Dist. No. 11AP-944, 2013-Ohio-1140, ¶ 61, citing *State v. Johnson*, 10th Dist. No. 10AP-137, 2010-Ohio-5440, ¶ 34; *State v. Garner*, 74 Ohio St.3d 49, 64, (1995).  The trial court committed error when it allowed improper testimony by police officers that was admittedly offered to bolster Ward's credibility.  Likewise, the trial court erred by failing to grant Zimmerman a new trial based on a direct admission that the jury was exposed to, and spent at least some time considering in its deliberations an excluded and salient piece of evidence, the photo of Zimmerman's knife, for which admission had been denied by the trial court.  The individual prejudicial effect of each these errors was significant and, when considered in context of the rest of the evidence adduced at trial, the collective or cumulative effect of these issues deprived Zimmerman of a fair trial.

{¶ 35}  Ward testified that as she and Zimmerman drove, they had a conversation about prostitutes who had been found dead in a cornfield, but she equivocated on who brought it up and inconsistently described Zimmerman's demeanor during their conversation.  (Tr. at 42-43, 94-97, 114.)  When Zimmerman allegedly drove to the cornfield; Ward said she told Zimmerman she was not comfortable with the location and Zimmerman responded that it would all be over soon.  (Tr. at 46.)  But Ward vacillated on whether this was an intimidating inference that Zimmerman intended to kill her or an attempt to comfort her.  (Tr. at 46, 99-100.)  Under questioning from the prosecution, Ward described a scene where Zimmerman slashed at her with a knife when she refused his order to get in the back seat of the van and that he grabbed for her as she escaped out the van door.  (Tr. at 48-50, 116.)  Yet when questioned by the defense, she acknowledged that the van had power locks but Zimmerman did not try to lock her in.  (Tr. at 97-98.)  She admitted

that she could have left the van at any time, that Zimmerman never tried to stop her from leaving the van, and he made no attempt to chase her when she ran away. (Tr. at 97-98, 107, 111.) She also admitted that she had seen Zimmerman in the neighborhood since the event and that he had never approached her again. (Tr. at 50, 90.)

{¶ 36} At one juncture, Ward explained that her memory sometimes suffers due to a brain injury she suffered as a small child. (Tr. at 92.) Ward also offered additional evidence of impairment, testifying that at the time of the alleged offense she was severely addicted to heroin and was experimenting with crack cocaine. (Tr. at 59-60, 63-64, 71.) She admitted that she had resorted to prostitution to pay for her drug habit but that she generally did not make enough to pay for her drugs, since at the time of the incident, she was consuming $400 in heroin per day while making only $100 to $200 per day by prostitution. (Tr. at 34, 83-84.) She acknowledged that heroin dulled her senses, that she sometimes would lose time while on a "bender," and that she sometimes would become quite desperate for drugs. (Tr. at 66-69.) She also stated that she had used heroin within hours of the offense but needed another dose when she encountered Zimmerman and that her time was wasted when he did not pay her. (Tr. at 95-96, 111-12, 118-20.)

{¶ 37} Because the evidence of kidnapping in this case was not entirely supportive of the State's allegations, because the knife picture was prejudicial, because Ward's credibility problems were improperly bolstered by officers who repeated her story and were permitted to tell the jury that they believed Ward, Zimmerman was denied a fair trial. Zimmerman's fourth assignment of error is sustained.

### D. Third and Sixth Assignments of Error – Moot

{¶ 38} Sustaining Zimmerman's first, second (in part), and fourth assignments of error necessitates a remand for a new trial. Thus, issues concerning the efficacy of counsel and questions regarding the manifest weight of the evidence are now moot. Accordingly, Zimmerman's third and sixth assignments of error are moot and considered no further.

### E. Fifth Assignment of Error – Whether Zimmerman's Conviction was Insufficiently Supported by the Evidence

{¶ 39} Zimmerman's asserts a fifth assignment of error that his conviction for kidnapping was insufficiently supported by the evidence. Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a

> matter of law." * * * In essence, sufficiency is a test of adequacy.
> Whether the evidence is legally sufficient to sustain a verdict is
> a question of law.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); Black's Law Dictionary 1433 (6th Ed.1990).  "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 40} Although we have sustained assignments of error requiring reversal and remand for a new trial, we nonetheless address the fifth assignment of error challenging the sufficiency of the evidence because if it were to be sustained, Zimmerman's criminal matter in this instance would be over—the charges could not be retried.  That is, "the Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence.  However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 47 (1982).  Hence, though Zimmerman's other assignments of error are rendered moot, the fifth assignment of error remains a live controversy that this Court now attempts to resolve.

{¶ 41} As indicted in this case, kidnapping is defined as follows:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (3) To terrorize, or to inflict serious physical harm on the victim.

R.C. 2905.01(A)(3).  Some of Ward's testimony indicated that Zimmerman induced her to go with him to his house by promising $300 and drugs.  (Tr. at 41-43, 71-72, 91-92.)  Yet, instead he took her to a cornfield where he terrorized her with a knife and attempted to force her into the back of his van.  (Tr. at 42-51.)  Although Ward contradicted and

equivocated on this version of events in other portions of her testimony (*see supra* at ¶ 35) and although there were other general reasons to doubt her credibility (*see supra* at ¶ 36), when "viewing the evidence in a light most favorable to the prosecution," we find that a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Monroe* at ¶ 47.

{¶ 42} We overrule Zimmerman's fifth assignment of error.

## IV.  CONCLUSION

{¶ 43} Because the evidence against Zimmerman was inconsistent and not expansive, we hold that the jury foreperson's admission that she had seen the excluded knife picture and relayed what she saw to the other jurors at the outset of deliberations, prejudiced Zimmerman.  Likewise, testimony by officers to vouch for Ward's credibility and buttress it through hearsay was also prejudicial.  Given the questionable and contradictory nature of the evidence against Zimmerman, such errors may have been individually sufficient to deny Zimmerman a fair trial and were certainly cumulatively sufficient.  We thus sustain Zimmerman's first, second (in part), and fourth assignments of error and remand for a new trial.  This renders Zimmerman's third and sixth assignments of error moot.  Though the evidence was contradictory and in conflict, there was some evidence which, if believed, would establish the necessary elements of the offense.  Thus, taking the view of the evidence most favorable to the prosecution, there was sufficient evidence for Zimmerman's conviction.  We therefore overrule Zimmerman's fifth assignment of error and overrule in part Zimmerman's second assignment of error.  The judgment of the Franklin County Court of Common Pleas is reversed and remanded for a new trial.

*Judgment reversed and*
*remanded for a new trial.*

HORTON, JJ., concurs.
DORRIAN, L. conurs in part and dissents in part.

DORRIAN, J., concurring in part and dissenting in part.

{¶ 44} Regarding the fifth assignment of error, I concur with the majority that there was sufficient evidence to support the jury's verdict and would overrule the fifth assignment of error.

{¶ 45} Regarding the first assignment of error, I respectfully dissent and would overrule the first assignment of error.  First, the majority decided a question which I believe

warranted supplemental briefing from the parties because neither party addressed it in their briefs, there is no precedent from our court, and there is precedent from the Second District Court of Appeals, *State v. Spurlock*, 2d Dist. No. 17954 (Sept. 29, 2000), different from the precedent the majority now sets. The question is: Does "impropriet[y] of any officer of the court," in the context of Evid.R. 606(B), require bad faith or willfulness on the part of the officer of the court? The majority finds, in effect, there is no such requirement.[4] In this case, the answer to the question would be determinative of whether the court could consider the foreperson's testimony without outside evidence or whether the aliunde rule applies. Second, notwithstanding the trial court's determination that the aliunde rule did apply to exclude the foreperson's testimony, the court considered the testimony in deciding to deny appellant's motion for new trial. I would affirm the trial court's finding but for different reasons. I would affirm because, applying the standard in Crim.R. 33(A) and (E), I am not convinced that "it *affirmatively appears* from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." (Emphasis added.) Civ.R. 33(E)(5).

{¶ 46} There are a lot of unanswered questions from the October 11, 2017 hearing with the foreperson, which would require much speculation on the court's part regarding what the other jurors knew and what effect the information had on them. For example, when the foreperson told the other jurors—how did she describe the knife? Did she say it did not match the description of the pocket knife the witness gave at trial? Even if the foreperson did describe the knife, without additional context, the jurors were left to purely speculate about where the knife came from, who owned it, and where it was found. The foreperson herself inquired with the attorneys after the trial where the knife came from. There was no request by appellant to follow-up with these questions or ask for more detail from the foreperson. Furthermore, although the majority notes the foreperson was speculating as to whether her fellow jurors believed her, it is also speculation as to whether the information had any effect on the deliberations by the other jurors. (Majority opinion at ¶ 25.) Again, there was no request by appellant to follow-up with the other jurors once

---

[4] In paragraph 18, the majority notes, and I agree, there is nothing to suggest in this case that the prosecutor intentionally or maliciously showed the juror the excluded evidence.

the court and counsel learned that the foreperson had shared the information prior to when the jury began deliberating. Therefore, I would overrule the first assignment of error.

{¶ 47} Regarding the second assignment of error, I respectfully dissent because I would find the alleged bolstering testimony of the police officer witnesses to not be plain error, to not be error when taken in context, and to be harmless. First, as the majority points out, the testimony of the officer that he found Ward to be "honest" was not plain error. Second, there was an initial objection by appellant regarding the officer testifying to what Ward told him while he was conducting his investigation. In response, the prosecutor explained, "It's not offered for the truth of the matter asserted. It's being offered for what he did next in the investigation." (Tr. Vol. II at 136.) There was no continuing objection, however, the court stopped the officer mid-way through his testimony and instructed the officer: "Officer, I'm going to stop you for one minute. Let's -- I definitely don't want to be talking about exactly what she said. More so, I understand *it's not being offered for the truth*, but specific statements are probably inappropriate to come in. Let's talk about in general terms what happened and then what he did as a result." (Emphasis added.) (Tr. Vol. II at 137.) There was no request for a curative instruction, and the court did not give a curative instruction, but the jury heard both the judge and the prosecutor say the testimony is not offered for the truth. Furthermore, although the majority states the prosecutor indicated that "the officer's testimony, repeating what Ward told him, was intended to improve Ward's credibility." (Majority opinion at ¶ 30.) The transcript reveals that the prosecutor's statement was made in a different context. In response to the defense objection to the prosecutor asking the officer whether prostitutes report crimes often, the prosecutor stated, "[i]t's going to go towards her credibility." (Tr. Vol. II at 140.) Furthermore, the court sustained the defense objection to that question and instructed the prosecutor to rephrase the question.

Q. Okay. So do prostitutes report crimes to you that often?

A. No, ma'am.

Q. Why not?

A. I think they're afraid to come forward because --

MR. DODGION: Objection.

MS. VAN CULIN: It's going to go towards her credibility. She stated yesterday they don't come forward because nobody believes her.

MR. DODGION: He's speculating.

MS. VAN CULIN: He's using his experience.

THE COURT: Okay. I think the question in its current form needs to be rephrased. I will sustain the objection.

Q. (By Ms. Van Culin) Detective, in your three years on the south side, how many prostitutes did you talk to a day?

A. At least one or two a day.

Q. Okay. On those daily encounters, how often did they report a crime that occurred to them?

A. Almost never.

(Tr. Vol. II at 140-41.)  Finally, I agree with the majority that the police officer witness's statement that he "believed" Ward when she relayed to him what happened was in error. However, I note that both Ward and the officer were subject to cross-examination, and on cross-examination, the officer admitted he had only met Ward one time and he did not run a warrant check on her.  Thus, I would consider the error to be harmless.  Therefore, I would overrule the second assignment of error.

{¶ 48} Regarding the fourth assignment of error, I respectfully dissent because I would not find there was cumulative error.  Therefore, I would overruled the fourth assignment of error.

{¶ 49} Accordingly, I would consider the third and sixth assignments of error, which the majority has determined to be moot.

{¶ 50} For these reasons, I respectfully concur in part and dissent in part.

_____