[Cite as *State v. Burgett*, 2019-Ohio-5348.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :           APPEAL NO. C-180029
                                                    TRIAL NO. B-1602360
    Plaintiff-Appellee,            :
                                                    *O P I N I O N.*
  vs.                                  :

MONIKA ENRIQUEZ BURGETT,                 :

    Defendant-Appellant.           :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Sentence Reversed in Part, and
                            Cause Remanded

Date of Judgment Entry on Appeal: December 27, 2019


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1} After a jury heard testimony that Monika Burgett mispresented symptoms her young son was allegedly experiencing causing doctors to provide unnecessary treatment and that she misrepresented, on the crowdfunding website, GoFundMe, that her son suffered from a terminal illness, had a brain tumor and no longer had medical insurance, a jury found her guilty of child endangering in violation of R.C. 2919.22(A), a first-degree misdemeanor, and telecommunications fraud in violation of R.C. 2913.05(A), a third-degree felony. The trial court sentenced her to five years of community control, with mandatory psychotherapy treatment and restricted travel outside of Ohio. The court also ordered her "to make restitution in the amount of $26,381 to Go Fund Me through the probation department."

{¶2} Burgett now appeals, challenging both convictions and the award of restitution.

### *History and Background*

{¶3} Defendant-appellant Monika Burgett is married to Jonathon Burgett, and they have three children. Their primary residence is in Texas, where their youngest child, J.B., was born prematurely, at 25 weeks gestation. He spent the first 100 days of his life in the neonatal intensive care unit. In late 2015, Mrs. Burgett and J.B., then aged three, moved to Cincinnati seeking medical care at Cincinnati Children's Medical Center ("CCMC") for J.B.'s genetic disorder, neurofibromatosis ("NF1"). NF1 is a genetic disorder that causes an accumulation of proteins, or benign tumor-like growths, in various parts of the body. While living in Texas, J.B. had a growth on the roof of his mouth, which caused him pain and difficulty eating and

swallowing. To alleviate these symptoms, Texas medical providers inserted a feeding tube into J.B.'s stomach. J.B. also has Chiari malformation, a condition where the base of the brain connected to the spinal cord sits too low and enters into the spinal canal. This condition can cause a compression of nerves, and can limit cognitive function and cause pain. J.B. has not suffered any effects from the Chiari malformation.

{¶4} Prior to moving to Cincinnati, J.B. began treatment for NF1 at Dell Children's Hospital Comprehensive Care Clinic ("the CCC") in Austin, Texas. Three medical professionals from Texas testified at trial. Dr. Rachel Berhane and nurse practitioner Valerie Maclaurin testified at trial that Mrs. Burgett exaggerated J.B.'s symptoms, falsely represented herself as a doctor and would see other physicians or specialists, without referral, even though the CCC had advised no treatment was warranted. The CCC consulted with Dr. George Edwards, an expert in pediatrics and medical child abuse, who reviewed J.B.'s medical history and found that (1) Mrs. Burgett had misrepresented herself to providers, undermining their confidence in her reporting of J.B.'s symptoms; (2) she had self-referred to other providers without the CCC's knowledge, when the CCC was responsible for coordinating J.B.'s care; and (3) this fragmentation of care caused J.B. to receive unnecessary procedures, which carry a risk of harm. Dr. Edwards advised the CCC to consult with the Burgetts in person and in writing about the doctors' concerns. If that was unsuccessful in resolving their concern over J.B.'s care, then Dr. Edwards advised the CCC to contact child-protective services.

{¶5} Dr. Berhane testified that she provided a letter to Mrs. Burgett on March 27, 2014, and scheduled a follow-up meeting with the Burgetts and Dr.

Edwards, but that Mrs. Burgett canceled the meeting. The CCC contacted child-protective services, but after investigating, the Texas agency closed the case finding the medical-child-abuse claim unsubstantiated.

{¶6} Jonathon Burgett testified that he and his wife sought second opinions because they wanted the best care for their son and the most noninvasive treatment for him. He said that the family only sought a second opinion in two instances. He testified that they left the CCC and sought treatment in Ohio, believing CCMC could provide the best care for J.B. He explained that their family was suffering financially because of the cost of medical care and living expenses for the family in Texas and Cincinnati. Finally, Jonathon testified on cross-examination that he was unaware that the CCC had provided a letter to Mrs. Burgett detailing their medical professionals' concerns, including the fact that she was exaggerating J.B.'s symptoms.

{¶7} J.B. began receiving care in Cincinnati in April 2015. He met with a team of doctors, which included Dr. Steven Smith, Dr. Alexandra Szabova, and Dr. Vincent Mukkada. All three physicians testified as experts at trial and noted that medical professionals rely on a caregiver's report of symptoms, especially with young children, in developing a diagnosis and treatment plan. Each doctor expressed concern that Mrs. Burgett's symptom reporting was inconsistent with behaviors the doctors had observed in the clinic, particularly with respect to reports of pain, vomiting, difficulty eating, and J.B.'s need for increased oxygen intake. Because of Mrs. Burgett's symptom reporting, J.B., had a different, "longer," type of feeding tube placed, was prescribed narcotics for pain, and was kept on oxygen, 24 hours a day, limiting his mobility.

4

{¶8}   Dr. Mukkada reported his concerns to Dr. Robert Shapiro, the director of the Mayerson Center for Safe and Healthy Children, a clinic affiliated with CCMC. Dr. Shapiro, an expert in pediatrics and child abuse, investigated J.B.'s medical history and determined that there was a difference between Mrs. Burgett's symptom reporting and what doctors and nurses were observing during J.B.'s visits.  In May 2016, he contacted the Hamilton County Department of Job and Family Services ("HCJFS") to notify it of three specific concerns of potentially unnecessary treatment related to J.B.'s care: (1) pain-management; (2) oxygen intake; and (3) feeding/eating issues. HCJFS began an investigation, which resulted in a "therapeutic separation" between J.B. and Mrs. Burgett.  During this separation, J.B. was admitted to CCMC where the doctors treated J.B. based on observation, symptoms, and test results.  They discovered that J.B. did not require narcotic pain medication, that he was able to eat by mouth, and that J.B. only required oxygen intake at night.

{¶9}   Chris Lah, the senior director of the revenue cycle at CCMC testified that J.B.'s medical services cost $490,000, and that J.B.'s private insurance and Ohio Medicaid paid most of it.  J.B.'s insurance changed to Medicaid after he was removed from Mrs. Burgett's care.  There was a family balance of $4,916 remaining at the time of trial.

{¶10} Dr. Hala Sabry is the founder of Physician Moms Group ("PMG"), a physician's-only networking group organized on the social-media platform Facebook.  Dr. Sabry testified that she became acquainted with Mrs. Burgett after she had posted on PMG's Facebook page her frustration that J.B. had a terminal illness and that she was trying to get him admitted into a clinical trial in Cincinnati but was

having trouble figuring out how to apply for Medicaid. Dr. Sabry reached out to Mrs. Burgett to see if PMG could help. After several emails, text messages and phone calls, a GoFundMe campaign was created to raise money for J.B.'s medical care. Dr. Sabry posted the GoFundMe campaign on both of her Facebook accounts–PMG and her personal account. She did not donate to the campaign.

{¶11} Dr. Sabry became suspicious of Mrs. Burgett's physician status and began inquiring into her professional background, discovering that Mrs. Burgett was not a physician. Dr. Sabry then removed the GoFundMe campaigns from her social-media accounts.

{¶12} MJ Guttman, a volunteer with Jewish Family Services, which provides services to families with children treating at CCMC, testified that she had assisted Mrs. Burgett with housing, babysitting and groceries while Mrs. Burgett was in Cincinnati. In March 2016, Mrs. Burgett sent Guttman a text message with the link to her GoFundMe campaign asking her to post it on her social-media accounts.

{¶13} Mrs. Burgett admitted to detective Dana Jones that she had posted a picture of J.B. with no eyebrows and his hair shaved off on her GoFundMe webpage and had misrepresented that J.B. suffered from a brain tumor and that the family had no insurance coverage for J.B.'s treatments. She also admitted to telling Dr. Sabry and MJ Guttman that J.B. had cancer and that she had asked them both to post the GoFundMe pages on their social-media accounts.

{¶14} Mrs. Burgett's GoFundMe campaign raised $26,381. Mrs. Burgett transferred that money to her personal bank account at JP Morgan Chase. The Burgetts stated that they used the money for medical and living expenses for the family in both Ohio and Texas. The state introduced GoFundMe corporate records

6

into evidence, which listed the individual donor names and the amount donated to the campaign for J.B.'s medical care. GoFundMe has a guarantee to pay back donors who donate to a fraudulent campaign and has a system in place to refund money. At the time of sentencing, GoFundMe had begun to refund those donors who had contributed to Mrs. Burgett's campaign.

### *Restitution*

{¶15} In her first assignment of error, Mrs. Burgett argues that the trial court erred by awarding restitution to GoFundMe because it does not meet the definition of "victim" under R.C. 2929.18(A)(1).

{¶16} R.C. 2929.18(A)(1) allows a trial court to order restitution "by the offender to the victim of the offender's crime * * * in an amount based on the victim's economic loss." If the court imposes restitution, the statute further provides that restitution may be made "to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court."

{¶17} The issue of who constitutes a "victim" under R.C. 2929.18(A)(1) or to whom restitution may appropriately be awarded under the statute is a question of law that is reviewed de novo. *State v. Cartwright*, 12th Dist. Fayette No. CA2016-11-018, 2017-Ohio-7212, ¶ 11.

{¶18} Because "victim" is not defined in R.C. 2929.18, this court has applied the definition of "victim" found in R.C. 2930.01(H)(1), which defines a "victim" as "[a] person who is identified as the victim of a crime * * * in a police report or in a complaint, indictment, or information that charges the commission of a crime and that provides the basis for the criminal prosecution * * * and subsequent proceedings

7

to which this chapter makes reference." *State v. Thornton*, 1st Dist. Hamilton No. C-160501, 2017-Ohio-4037. Thus, this court, applying *Thornton*, has held that unless a person or entity is a named victim as set forth in R.C. 2930.01(H)(1), a trial court may not order a defendant to pay restitution to that party. *See State v. Adams*, 1st Dist. Hamilton No. C-180337, 2019-Ohio-3597, ¶ 15. Here, GoFundMe was named in the indictment.

{¶19} But while this appeal was pending, the Ohio Supreme Court released *State v. Allen*, Slip Opinion No. 2019-Ohio-4757, which makes clear that the definition of victim found in R.C. 2930.01(H)(1) is not applicable in determining whether a person or entity is a victim for purposes of ordering restitution under R.C. 2929.18. *Id.* at ¶ 13 (under R.C. 2930.01's express terms, the definitions in the victim's rights chapter are limited to that chapter and do not govern the provisions in R.C. 2929.18).

{¶20} In *Allen*, the Ohio Supreme Court held that a bank was a victim (and not a third party) for purposes of ordering restitution where the bank cashed a forged check and then recredited the depositor's account. In reaching that holding, the court noted that when a word is not defined in a statute, the courts are to "look to its ordinary meaning—that is, how it would commonly be understood in the context in which it occurs." *Id.* at ¶ 4. The Supreme Court cited to the definition of victim set forth in Black's Law Dictionary—a person or entity "harmed by a crime, tort, or other wrong"—in determining that the bank in *Allen* was a victim statutorily entitled to restitution. *Id.* To support its holding, the court set forth three reasons as to how the bank was harmed by the defendant's crime of theft, and thus, a victim: (1) the bank had a property interest in the money deposited into the bank; (2) the bank had a duty

to correct its erroneous deductions from a depositor's account; and, (3) the bank had been "duped" by the defendant when he had presented the forged check to the bank teller. *Id.* at ¶ 6-9.

{¶21} In light of the decision in *Allen*, which sets forth the proper analysis to use in determining whether an entity is a victim for purposes of restitution, we remand this matter to the trial court to determine, under *Allen*, whether GoFundMe is a victim statutorily entitled to restitution[1], and if so, to then determine GoFundMe's economic loss. The first assignment of error is sustained.

### Telecommunications Fraud

{¶22} In her second assignment of error, Mrs. Burgett contests the sufficiency of the evidence to support raising the offense of telecommunications fraud to a third-degree felony.

{¶23} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶24} Typically, the offense of telecommunications fraud is a fifth-degree felony. Nevertheless, the level of the felony can be raised to a third-degree felony where the evidence demonstrates that the benefit obtained by the offender is more than $7500 but less than $150,000. R.C. 2913.05(C). Here, the state presented the corporate records of GoFundMe, which lists the name of each donor to Mrs.

---

[1] A new judicial ruling is applicable to cases that are pending on the announcement date. *Ali v. State*, 104 Ohio St.3d 328, 2004-Ohio-6592, 819 N.E.2d 687, ¶ 6, citing *State v. Evans,* 32 Ohio St.2d 185, 186, 291 N.E.2d 466 (1972).

Burgett's campaign and the amount he or she donated. The sum of all the donations was $26,381. Given that the business records of GoFundMe were admitted into evidence to show the benefit that Mrs. Burgett gained by misrepresenting the status of J.B.'s health and health-insurance coverage, there was not a need for each donor to the campaign to testify as to the individual amount donated.

{¶25} Viewing the evidence in a light most favorable to the state, we hold that there was sufficient evidence presented to demonstrate that Mrs. Burgett benefited from her offense in an amount over $7500 but less than $150,000. The second assignment of error is overruled.

### *Out-of-State Medical Testimony*

{¶26} In her final assignment of error, Mrs. Burgett maintains that the trial court erred by admitting testimony regarding out-of-state medical care for J.B. An appellate court "will not disturb a trial court's ruling on evidentiary issues on appeal absent an abuse of discretion and proof of material prejudice." *State v. Buck*, 1st Dist. Hamilton No. C-160320, 2017-Ohio-8242, ¶ 109, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181.

{¶27} At trial, Mrs. Burgett objected to the testimony of the Texas medical professionals, arguing that the testimony was irrelevant to the charges of child endangering filed in Cincinnati. We disagree.

{¶28} Evid.R. 401 states broadly that "relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible. *See* Evid.R. 402. Here, the Texas medical professionals testified as to J.B.'s issues as a premature infant, his diagnosis

and prognosis, and the treatment he had received while in their care. This testimony gave the jury J.B.'s medical history, which helped the jury evaluate whether Mrs. Burgett was violating a duty of care to her son by continuing to seek unnecessary treatment and/or whether she was exaggerating J.B.'s medical symptoms to the doctors in Cincinnati. Although this evidence is relevant to the child-endangering offense, out of an abundance of caution, the trial court gave a limiting instruction to the jury reminding them that only conduct that occurred in Cincinnati, Ohio, could be considered in determining whether Mrs. Burgett had committed any of the charged offenses.

{¶29} Given the foregoing, we cannot say that the trial court erred in admitting the testimony of the Texas medical professionals based on relevancy.

{¶30} Next, Mrs. Burgett argues that the testimony of the Texas medical professionals regarding her conduct while at the CCC—exaggerating symptoms, mispresenting that she was a physician, being investigated by child-protective services in Texas—was improper other-acts evidence, which denied her a fair trial. However, Mrs. Burgett did not object to the testimony of the Texas medical professionals as other-acts evidence and, thus, she has forfeited all but plain error. For this court to reverse on plain error, we must find that (1) there was an error, (2) the error was plain, i.e., an obvious defect in the trial court proceedings, and (3) the error affected substantial rights, i.e., it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶31} Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence, may, however, be admissible for other

purposes, including "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 68; *see* R.C. 2945.59.

**{¶32}** Generally, other-acts evidence is admissible if (1) it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), (2) it is relevant when offered for that purpose, and (3) the danger of unfair prejudice does not substantially outweigh the probative value, Evid.R. 403. *Kirkland* at ¶ 68, citing *State v. Williams*, 143 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

**{¶33}** Based on a review of the record, we cannot say that the trial court committed plain error by admitting the testimony of the Texas medical professionals. First, it was not error to admit the testimony of the Texas medical professionals. Their testimony demonstrated Mrs. Burgett's knowledge of what type of treatment J.B. required and demonstrated the absence of mistake or accident in Mrs. Burgett's reporting of J.B.'s symptoms and decision to seek care at CCMC. The evidence showed that she was aware that medical professionals rely on a caregiver's report of a child's symptoms in determining treatment and that exaggerating symptoms could put J.B. at risk of receiving unnecessary treatment. Further, even if it was error to admit that testimony, there was no indication that that the outcome of the trial would have been different without it. In fact, the complete picture of J.B.'s medical needs as well as the fact that the Texas child-protective service agency's investigation did not result in criminal charges actually supported Mrs. Burgett's defense that she was merely seeking the best care for J.B.

**{¶34}** Accordingly, we overrule the third assignment of error.

{¶35} In conclusion, we reverse the award of restitution and remand the matter to the trial court to employ the *Allen* analysis to determine whether GoFundMe is a victim for purposes of restitution, and if so, to determine GoFundMe's economic loss. We affirm the trial court's judgment in all other respects.

Judgment accordingly.

**ZAYAS** and **CROUSE, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.