[Cite as *State v. Barber*, 2021-Ohio-1506.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :        APPEAL NO. C-190338
                                                 TRIAL NO. B-1701852-A
    Plaintiff-Appellee,             :

                                        :        *O P I N I O N.*

  vs.                                   :

                                        :

DEONTE BABER,                           :

    Defendant-Appellant.            :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  April 30, 2021


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah Nelson*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Presiding Judge.**

{¶1} A lunchtime work excursion turned tragic when a driver accidentally hit and injured a young boy. The boy's father responded in fury by throwing open the car door and pummeling the driver. A crowd gathered, with some tending to the boy, some trying to intercede in or break up the fight, and others probably just wondering what all the commotion was about. During the melee, someone shot and killed the driver. After the gunshot, the father grabbed his son and raced to the hospital, calling 911 en route. Believing he had disconnected the call, he then turned to his son and told the boy (repeatedly) that he (the father) had killed the driver. Although that recorded confession seemed damning, the investigating officers soon focused their gaze on an alternative suspect, defendant-appellant Deonte Baber, and the father proved eager to assist in diverting attention from himself. The father identified Mr. Baber as the shooter, and the officers believed that a video that captured the shooting validated that conclusion. The jury ultimately agreed, convicting Mr. Baber for murder, from which he now appeals, bringing seven assignments of error.

{¶2} Although we see a few errors in the trial proceedings, none rise to the level of reversible error. The evidence against Mr. Baber, while certainly not overwhelming, was powerful and probative, including the video recording and eyewitness identifications. Taking into account the totality of the record, we find the errors at hand harmless, and therefore we affirm the trial court's judgment.

I.

{¶3} This case begins with Jamall Killings strolling home with his two young sons, ages four and two, in tow. He paused to talk with a neighbor, and as children sometimes do, his youngest darted into the street. Mr. Killings soon realized the breakaway, stopped oncoming traffic, and went to retrieve him; leaving his older son at the side of the road.

Unfortunately, as he secured the two-year-old, the four-year-old wandered into the street and was struck by Jamie Urton, driving on a lunch outing with a colleague. Fortunately, the child survived. Mr. Urton would not.

{¶4} Footage obtained from a neighbor's video-doorbell showed Mr. Killings essentially ignoring his stricken child and instead pouncing on Mr. Urton. He threw open the door and began beating Mr. Urton. The car's passenger, Richard Williams, came around the vehicle and attempted to stop the altercation. Onlookers also began to materialize. And sometime during this mayhem, Mr. Urton was shot, ultimately succumbing to his injuries.

{¶5} A good Samaritan offered to drive Mr. Killings's son to the hospital. On the way, Mr. Killings called 911 and, after believing he had hung up, proceeded to tell his son that he had shot and killed Mr. Urton.

> [T]hat's why I killed him [], but you can't run out into the street. * * * I killed
> him, he dead. He dead. The dude who hit you with the car, he dead, I killed
> him. I'm serious, he dead. The dude who hit you with the car, I killed him [].
> He dead. You hear me? He dead. I killed him. * * * He dead, so you'll be
> good. Your daddy got you.

{¶6} After hearing this confession on the 911 call, police intercepted Mr. Killings at the hospital and arrested him. They swabbed his hands for gunpowder residue, which revealed small traces of a substance found in gunpowder. Mr. Williams also identified Mr. Killings as the shooter. At first blush, this appeared to be an open and shut case. There was motive, a voluntary (and spontaneous) confession, gun powder residue, and a positive identification. But things would not remain so simple.

{¶7} Police soon learned of the video footage, which prompted them to look for another suspect, ultimately settling on Mr. Baber. In the video, a person wearing a blue and

3

orange hoodie jacket can be seen running up to the car during the altercation. The individual then runs away with his arm extended toward the car (as though possibly shooting a gun). Unfortunately, the video is too far away to show whether that individual was holding a gun or even what the person looked like.

{¶8} Mr. Killings soon backtracked on his confession, professing to have made the statements in an effort to console his son. Instead, he assured police that an individual wearing a blue and orange jacket had come up to the car and shot Mr. Urton (for apparently unknown reasons). He also provided a basic description that a detective with familiarity of the neighborhood thought might match Mr. Baber. Scrolling through Facebook, the detective stumbled upon a picture of Mr. Baber wearing a blue and orange jacket that appeared similar to the one in the video. Suddenly, Mr. Baber emerged as a focal point of the investigation.

{¶9} Ballistics evidence proved inconclusive. As already noted, police pulled a small amount of gunpowder residue from Mr. Killings's hand. However, a police investigator testified that the trajectory of bullets that struck the driver's door suggested that Mr. Killings was not the shooter. The gun was never found, so no fingerprints or other identifying information could be gleaned. And none of the remaining ballistics evidence linked the shooting to Mr. Baber.

{¶10} Eyewitness descriptions were not a portrait of clarity. As already noted, Mr. Killings offered the basic description which led police to identify Mr. Baber. And after being shown a photo lineup, he identified Mr. Baber as the perpetrator. A nearby resident also stated that she saw a person wearing a blue and orange jacket running from the general direction of the scene. She identified that person as Mr. Baber once she viewed a photo lineup. However, by her own admission, she did not actually see the shooting. Additionally,

4

Mr. Williams vacillated on his identification, retracting his initial identification of Mr. Killings as the shooter, admitting that, due to his glaucoma, his eyesight was too poor to know who fired the shot. Conversely, two 911 callers provided different descriptions of the shooter. One described the shooter as wearing a white hoodie and the other recalled a green hoodie.

{¶11} Mr. Baber's defense was two-pronged: (1) that Mr. Killings, rather than himself, shot Mr. Urton; and (2) that he was not the person in the video wearing the blue and orange jacket. The case, then, largely came down to credibility and circumstantial evidence. Would the jury decide that Mr. Killings's motive and confession simply raised too much doubt to convict Mr. Baber? Or would the jury interpret the video (amplified by eyewitness identifications) as showing the person wearing the blue and orange jacket to be the shooter and identify Mr. Baber as that person?

## II.

{¶12} On appeal, Mr. Baber presents seven assignments of error, attacking various facets of the trial proceedings. We address the assignments in turn.

## A.

{¶13} In his first assignment of error, Mr. Baber argues that the trial court erred by permitting the prosecution to withhold disclosure of eight witness until the cusp of trial. As a general rule, parties must "provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief * * * ." Crim.R. 16(I). However, prosecutors may withhold this information by filing a certification of nondisclosure. *See* Crim.R. 16(D). But prosecutors cannot file nondisclosure certifications arbitrarily: as relevant here, a prosecutor must have "reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or

subject them to intimidation or coercion." Crim.R. 16(D)(1). "Reasonable, articulable grounds may include": "[1] the nature of the case, [2] the specific course of conduct of one or more parties, [3] threats or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, [4] whether the defendant is pro se, and [5] any other relevant information." Crim.R. 16(D). In other words, the prosecutor must provide "case-specific reasoning to justify the certification." *State v. Davenport*, 1st Dist. Hamilton No. C-130307, 2014-Ohio-2800, ¶ 39.

{¶14} The nondisclosure certification mustered here, steeped in generalities and vagueness, failed to satisfy Crim.R. 16(D). In fact, most of the certification simply incanted boilerplate language with no relation to this case:

It is the Assistant Prosecuting Attorney's experience that in virtually all homicide high level felony cases coercion and threats to witnesses can play a critical role. With today's broad expansion of information via the Internet and cell phones, witnesses' names can quickly spread through the community.

{¶15} We have previously held that nearly identical language lacked a case-specific justification. *State v. Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, ¶ 16–17. Beyond that boilerplate, the certification mentioned the allegations of this case, but was devoid of any indicia of threatening or intimidating behavior. It indicated that Mr. Baber "associated" with people who traffic narcotics and possess firearms; and that he and other associates had been seen firing weapons. Although the certification suggested that "several witnesses have stated concerns for their safety," it offered no substantiation of this point, merely concluding: "These threats are real and the only way to protect the witness[es] in this case is by a non-disclosure order." The certification lacked any indication that anyone had threatened or even contacted a witness, or any other grounds to suggest that witness

6

safety might be compromised. Opaque allegations that Mr. Baber's associates are criminals and own firearms, without more, do not make the cut, and indeed, they shed little light beyond the boilerplate language quoted above. These allegations also strain credulity considering that, at a minimum, the two 911 callers provided potentially *exculpatory* information, and thus presumably had no reason to fear retribution from Mr. Baber.

{¶16} Nonetheless, "[t]his court has stated that while generalized assertions in the prosecutor's certification are insufficient to meet the requirements of Crim.R. 16(D), that defect could be cured during the hearing provided for in Crim.R. 16(F)." *State v. Wallace*, 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 40, citing *Williams* at ¶ 18. The privilege to cure pursuant to a Crim.R. 16(F) hearing should not be warped, however, into a license to evade Crim.R. 16(I). At the Rule 16(F) hearing in this case, a detective testified that one of the witnesses recognized Mr. Baber from an earlier incident in which he allegedly fired shots into the air. He further conveyed this witness's displeasure about being contacted and indicated that all of the witnesses expressed concern for their safety. The detective seemed to premise his conclusion of a risk of reprisal on the fact that Mr. Baber's associates lived in that community. But at the same time, he conceded that he had no evidence that Mr. Baber (or any associate) had contacted any potential witness or had otherwise threatened anyone involved in this case. Nor did he have any evidence that Mr. Baber had even been in contact with these "associates" since his incarceration.

{¶17} Although the state acknowledges that the "case-specific" evidence primarily consisted of witnesses' fear, it nonetheless argues that the fear reflected on this record suffices. For justification, the state points to *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, where the Supreme Court explained that "a prosecutor is not precluded from taking a witness's own impressions into account when deciding whether to

disclose that witness's identity." *Id.* at ¶ 54. But *McKelton* does not help the state here, because the nondisclosure in that case contained four substantive justifications: (1) the defendant had previously been convicted of witness intimidation; (2) a jailhouse letter instructed an associate to post witness names in public; (3) an associate stated they would "John Brown" the case (a reference to a case where every witness disappeared or recanted their statements); and (4) a witness whose name had been disclosed was shot. *Id.* at ¶ 48. Needless to say, these concrete justifications are a far cry from the assertions of witness apprehension in this case.

{¶18} Furthermore, our case law has generally required actual, case-specific justifications for every nondisclosed witness. *See, e.g., State v. Woods*, 1st Dist. Hamilton Nos. C-130413 and C-130414, 2014-Ohio-3892, ¶ 35 (analyzing the case-specific justifications for both witnesses separately); *Wallace,* 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, at ¶ 38–41 (expressing doubt whether defendants' well-known reputation as "robbery boys" and violence was sufficiently case-specific, but declining to decide for other reasons); *Davenport*, 1st Dist. Hamilton No. C-130307, 2014-Ohio-2800, at ¶ 40–41 (holding that intimidation of witnesses by defendant's family and continued attempts to identify and contact other witnesses was sufficiently case-specific); *State v. Harris*, 1st Dist. Hamilton No. C-110472, 2012-Ohio-349, ¶ 30–31 (holding that one witness being approached and threatened was sufficient justification to withhold disclosure of all four witnesses); *State v. Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, ¶ 26–27 (finding sufficient justification not to disclose four witnesses where one witness was a member of the same gang as the defendant, another witness was in close proximity to the gang, a third witness was personally threatened, and the fourth witness had seen multiple murders by the same gang). At the same time, this does not mean that the

justifications need to specifically relate to each witness, particularly when we see a serious instance or pattern of witness harassment or intimidation. *See McKelton* at ¶ 53 (stating that "Crim.R. 16 specifically contemplates nondisclosure" for justifications unrelated to the witnesses).

{¶19} Here, we conclude that the state failed to cure its inadequate certification of nondisclosure. While we are of course sensitive to the risks of witness intimidation or harassment, vague bromides about witness fear, without more, fall short—as do generalized assertions of criminal behavior. Short of pointing to the case at bar, the state provided no evidence of threatening or violent behavior, or even that any witness had been contacted. And although witness fear is certainly relevant, only one witness's fear was substantiated with any detail: the nearby resident who had previously seen Mr. Baber fire his gun into the air and expressed concern at being contacted. While this might have sufficed for that witness considering that she lived in the same neighborhood, we see no rationale for extending this incident to justify withholding the other seven witnesses absent any specifics of their circumstances or any threatening outreach by Mr. Baber or any of his compatriots. The detective acknowledged that he lacked any specific information regarding any of the other witnesses, and readily conceded the absence of any evidence of threats or intimidation. We therefore conclude that the trial court abused its discretion in approving the state's certification of nondisclosure. *See Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578, 592, 664 N.E.2d 1272 (1996) ("[T]he standard of review of a trial court's decision in a discovery matter is whether the court abused its discretion."). If the state can simply say "we are concerned because this is a serious case," without more, and avoid disclosure, it transforms Rule 16(I) into a hollow letter.

**{¶20}** Even though the trial court abused its discretion in endorsing the state's nondisclosure certification, we must nonetheless evaluate whether the error spells reversal. And to justify reversal, Mr. Baber must demonstrate material prejudice from the absence of the disclosures. *See State v. Allenbaugh*, 2020-Ohio-68, 151 N.E.3d 50, ¶ 30 (11th Dist.) (noting that a trial court's Crim.R. 16(K) rulings " 'will not be reversed on appeal absent an abuse of discretion and proof of material prejudice' "), quoting *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116; *Woods*, 1st Dist. Hamilton Nos. C-130413 and C-130414, 2014-Ohio-3892, at ¶ 34 ("This court * * * reviews a trial court's decisions concerning discovery—including, issues of witness disclosure—under an abuse-of-discretion standard."); *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 181 ("We will not reverse a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice.").

**{¶21}** Here, Mr. Baber's attempts to show material prejudice are speculative. He does not specify what exculpatory or impeachment evidence he could have unearthed with earlier access to the contact information of the witnesses. Nor did he seek a continuance below or marshal any type of proffer. It certainly stands to reason that Mr. Baber's fortunes might have differed had he, for example, interviewed the exculpatory 911 callers immediately after the fact, instead of two years later. But speculating on what might have been cannot justify reversal, particularly when counsel failed to develop the record on prejudice. *See Woods* at ¶ 35 ("[T]here was no showing that the witness in question would have provided exculpatory evidence or that [the defendant] was otherwise prejudiced by the nondisclosure."). Any claim of prejudice is further undermined by the fact that defense counsel received the names of the witnesses ten months prior to Mr. Baber's trial (an earlier trial was poised to begin, but the court granted a continuance for unrelated reasons). To be

10

sure, this information did not fully comply with Rule 16, but it should have enabled defense counsel to conduct an adequate investigation or seek appropriate relief from the court if such efforts were stymied by the lack of details. Therefore, in the absence of any indication of prejudice, we overrule this assignment of error.

## B.

{¶22} In his second assignment of error, Mr. Baber focuses upon prejudicial testimony injected by one of the state's witnesses regarding the video footage. Specifically, the lead detective testified that he zoomed in on the video, revealing a muzzle flash. From the context of his testimony, this indicated that the individual with the blue and orange sweatshirt (who the state fingered as Mr. Baber) fired the gun. If true, the detective's testimony would answer one of the central issues of the case: who fired the gun. Unfortunately, the testimony appears cut from whole cloth. Both parties agree that the testimony was inadmissible because the detective was invading the province of the jury. Nor did the prosecutor have any evidence that a muzzle flash could be identified in the video. Our review of the video likewise comes up empty with respect to any muzzle flash. Either the detective made up this evidence, or it existed and he neglected to share it with the prosecutors (or defense counsel).

{¶23} Defense counsel objected and the trial court instructed the jury to disregard the testimony. Mr. Baber then moved for a mistrial, which the trial court denied. Whether a mistrial should be granted generally rests in "the sound discretion of the trial court." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). But it " 'should not be ordered in a criminal case merely because some error or irregularity has intervened.' " *Id.*, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). In other words, a

mistrial is necessary only when "a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶24} On review, we will not disturb the trial court's grant or denial of a motion for a mistrial "absent an abuse of discretion." *Treesh* at 480; *see State v. Jones*, 1st Dist. Hamilton No. C-180091, 2019-Ohio-4862, ¶ 74 (same). "[W]e must determine whether, absent the error or irregularity, 'the jury would have found the appellant guilty beyond a reasonable doubt.' " *State v. Knight*, 2016-Ohio-8505, 78 N.E.3d 1267, ¶ 7 (9th Dist.), quoting *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317, ¶ 42 (10th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984).

{¶25} Here, Mr. Baber paints the detective's testimony as unfairly implicating him as the shooter, with obvious concomitant prejudice. We tend to agree with that point. As the trial court acknowledged, the video "itself does [not] provide any evidence of either the existence of a gun or a muzzle flash." And the only eyewitness to identify the person wearing the blue and orange jacket as the shooter was Mr. Killings—a self-interested witness who himself initially confessed to the crime. Thus, the detective's statement posed the risk of placing a heavy thumb on the proverbial scales. If a muzzle flash could truly be seen coming from the person wearing the blue and orange jacket, it might undermine part of Mr. Baber's defense—that Mr. Killings was the shooter.

{¶26} But, as a countervailing matter, it was undisputed that a gunshot killed Mr. Urton. From that perspective, the "muzzle flash" comment added little to the equation, and although the detective seemed to imply that it came from the individual believed to be Mr. Baber, he never connected those dots directly. Moreover, "[a] jury is presumed to follow the instructions given to it by the trial judge." *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994). Thus, we would ordinarily presume that that the jury could disregard the

12

detective's testimony and re-evaluate the video anew without considering the detective's commentary. As Mr. Baber emphasizes, however, this record reveals concerns that the jury could not abide by the judge's admonitions. During deliberations, the jury inquired: "Can we zoom in on video surveillance or magnify the video and still-photo of video, in some way?" Inexplicably, the trial court failed to alert counsel to the question, and proceeded to answer it ex parte, violating the maxim that " 'any communication between judge and jury that takes place outside the presence of the defendant is error * * * .' " *State v. Kelley*, 1st Dist. Hamilton No. C-140112, 2014-Ohio-5565, ¶ 33, quoting *Bostic v. Connor*, 37 Ohio St.3d 144, 149, 524 N.E.2d 881 (1988). Although the trial court correctly told the jury that it could not zoom in on the video, this question raises doubts regarding whether the jury followed the court's instruction. At the same time, the question can be viewed from another perspective—the jury was simply frustrated by the lack of clarity in the video and was asking if any enhancement was available.

{¶27} Although we agree with Mr. Baber that the detective's testimony was inadmissible and potentially prejudicial, after reviewing the totality of the testimony and the record surrounding the jury's question, we are unprepared to say that the trial court abused its discretion in denying a mistrial. As we have noted above, the state had other evidence of Mr. Baber's guilt and we cannot say that, absent the detective's testimony, a different result would have obtained. Mitigating the prejudicial effect, the detective did not expressly identify where the "muzzle flash" originated—and we all know a muzzle flash must have occurred somewhere because a gun was fired. The trial court took immediate and appropriate steps to blunt any potential prejudice, and thus we cannot say that this isolated comment warranted a mistrial. For these reasons, we overrule this assignment of error.

C.

**{¶28}** In his third assignment of error, Mr. Baber faults the trial judge's handling of a situation arising when an alternate juror viewed media coverage and discussed it with other jurors. Although it's not exactly clear what details from the media coverage that the juror shared, his commentary prompted another juror to note that he "wouldn't stop talking about it." The offending juror even went so far as to share that he was "pretty much convinced" of Mr. Baber's guilt. Perhaps needless to say, the juror's conduct violated instructions about avoiding media coverage and drawing premature conclusions that the trial court provided to all of the jurors.

**{¶29}** After learning of the violation, the trial court individually questioned each juror to determine who perpetrated the misconduct. Then, after dismissing the offending juror, the court collectively questioned the remaining jurors, asking anyone to raise their hand if they heard anything that would influence their verdict. To Mr. Baber, this collective questioning was inadequate to ascertain any taint on the remaining jurors. In other words, Mr. Baber posits that the trial court should have *individually* questioned the jurors to determine the effect of the misconduct.

**{¶30}** Mr. Baber's argument fails on two fronts. First, "[t]he scope of voir dire is generally within the trial court's discretion, including voir dire conducted during trial to investigate jurors' reaction to outside influences." *State v. Sanders*, 92 Ohio St.3d 245, 252, 750 N.E.2d 90 (2001). And the Ohio Supreme Court has specifically deemed permissible collective questioning of jurors to determine the effect of misconduct. *See id.* (holding that collective questioning about the effect of misconduct was sufficient because "the judge could reasonably assume that those who did not speak up were unaffected.").

14

{¶31} Second, Mr. Baber failed to request individual questioning below. As a general rule, parties are permitted to participate in rectifying juror misconduct. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 58 (" 'The trial court should not decide and take final action ex parte * * * but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.' "), quoting *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The trial court here did not act on its own accord, without consulting the attorneys. Indeed, the failure to request individual questioning precludes us from now finding an abuse of discretion, absent plain error. *See Lang* at ¶ 61 ("Moreover, neither the state nor the defense requested that the trial counsel individually question the jurors following this response. Thus, the trial court did not abuse its discretion by stopping there."); *State v. Lee*, 2018-Ohio-3957, 143 N.E.3d 1126, ¶ 26 (10th Dist.) ("Where the complaining party fails to object to the trial court's failure to question a juror or decision to not disqualify a juror for misconduct, an appellate court may notice a 'plain error' although it was not brought to the attention of the court."), citing *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 73. Without any record development on potential prejudice, we cannot find plain error. We therefore overrule this assignment of error.

## D.

{¶32} For his fourth assignment of error, Mr. Baber challenges the trial court's decision to take judicial notice of the date of the posting of a Facebook photo. The photo shows Mr. Baber wearing a blue and orange jacket, which the state latched upon as circumstantial evidence of his guilt, since the individual fleeing the shooting on the video wore (as best we can tell) a similar jacket. But, of course, the date of the photo mattered—if

he bought a new jacket after the shooting, the value of that photo would plummet. Defense counsel objected to the photo on hearsay grounds, and as a compromise, the trial court took judicial notice of the posting date. The court then failed to inform the jury that it was not required to accept the judicially noticed fact as conclusive.

{¶33} Because Mr. Baber did not object below, we review the trial court's actions for plain error. Crim.R. 52. "For this court to reverse on plain error, we must find that (1) there was an error, (2) the error was plain, i.e., an obvious defect in the trial court proceedings, and (3) the error affected substantial rights, i.e., it affected the outcome of the trial." *State v. Burgett*, 2019-Ohio-5348, 139 N.E.3d 940, ¶ 30 (1st Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶34} Evidence Rule 201(B) provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And the staff notes explain that "[t]he type of fact contemplated by 201(B)(2) includes scientific, historical and statistical data which can be verified and is beyond reasonable dispute." Finally, "[i]n a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." Evid.R. 201(G).

{¶35} At oral argument, the state conceded that the trial court erred by taking judicial notice of the photo's posting date. The dates of Facebook posts are not generally known or capable of ready determination, and they fall outside the scope of readily verifiable "scientific, historical and statistical data." *See, e.g., State of Ohio ex rel. Banker's Choice, LLC v. City of Cincinnati*, 1st Dist. Hamilton No. C-200017, 2020-Ohio-6864, ¶ 15 (holding that a trial court could not take judicial notice of documents to determine relevant

16

dates for deciding whether the suit was barred by the statute of limitations); *but see State ex rel. Richardson v. Gorman*, 117 Ohio App. 244, 246, 187 N.E.2d 411 (1st Dist.1962) (taking "judicial notice of the fact that September 30, 1962, fell on a Sunday"); *States Resources Corp. v. Hendy*, 9th Dist. Summit No. 25423, 2011-Ohio-1900, ¶ 20 (" 'Public records and government documents are generally considered "not to be subject to reasonable dispute." This includes public records and government documents available from reliable sources on the Internet.' "), quoting *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp.2d 968, 972 (W.D.Mich.2003).

{¶36} We agree that the court erred by taking judicial notice of the posting date of the Facebook photo. It is also undisputed that the trial court failed to inform the jury that it was not required to find that fact conclusive. But Mr. Baber's argument falters on the substantial rights prong of the plain error analysis. Even without the date of the social media post, the state properly presented the photo to the jury showing that Mr. Baber owned a jacket that was similar to the blue and orange jacket in the video. That admissible evidence and its impact dwarf the significance of the date of the post. As we already noted above, Mr. Baber did not object below and the jury did have other evidence that Mr. Baber wore a blue and orange jacket on the day of the shooting—Mr. Killings and the nearby resident's testimony. For these reasons, we decline to find plain error and overrule this assignment of error.

E.

{¶37} In Mr. Baber's fifth assignment of error, he broadens the aperture a bit, alleging that the cumulative effect of the court's errors deprived him of a fair trial. "Under the doctrine of cumulative error, 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though

17

each of numerous instances of trial court error does not individually constitute cause for reversal.' " *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.), quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Of course, the doctrine only applies where we "find multiple instances of harmless error." *Garner* at 64. But where multiple errors exist, we must inquire whether there is a " 'reasonable possibility that the evidence may have contributed to the accused's conviction.' " *State v. Echols*, 128 Ohio App.3d 677, 700, 716 N.E.2d 728 (1st Dist.1998), quoting *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987). In other words, " ' "there must be overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction." ' " *Leach* at ¶ 57, quoting *Echols* at 700, quoting *DeMarco* at 195.

{¶38} Although the cumulative error doctrine is necessarily case specific, the doctrine most often applies where the evidence is not overwhelming or when the outcome depends upon witness credibility. *See, e.g., Leach* at ¶ 58 ("[W]here the evidence of guilt was not overwhelming * * * * [w]e conclude that the cumulative effect of the errors identified by [the defendant] rendered his trial unfair."); *Echols* at 700 (finding cumulative error "where the evidence of guilt for each incident was not overwhelming"); *State v. Zimmerman*, 2019-Ohio-721, 132 N.E.3d 1185, ¶ 34 (10th Dist.) (finding cumulative error where police improperly testified to bolster victim's credibility and where the jury spent at least some time considering a photo of the defendant's knife which had inadvertently been shown).

{¶39} Here, we recognize three errors: (1) the inadequate justifications for witness nondisclosure; (2) the impermissible testimony regarding a muzzle flash; and (3) the court taking judicial notice of the date of the Facebook post. Even considering the aggregate impact of these errors, we fail to see how they command reversal. As explained above, any

18

prejudicial impact of the nondisclosures is speculative—and we cannot indulge such speculation simply because we are peering through the cumulative error lens. That leaves us with the date of the Facebook post and the detective's inopportune comment about the muzzle flash. Any prejudicial impact of both errors is slight (for reasons we've discussed above), and adding them together does not yield a conclusion that these errors contributed to Mr. Baber's conviction. We also recognize that the trial court took immediate steps to minimize any prejudicial impact of the detective's comment.

{¶40} When we measure these errors against the overall evidence, it only reinforces this conclusion. Although the state's evidence may not have been overwhelming, it was powerful, enhanced by the impact of the video evidence, the picture of Mr. Baber in similar attire as the presumptive shooter, and the testimony from the eyewitnesses. Evaluating the strength of this evidence against the effect of the two errors convinces us that the cumulative effect of these errors did not deprive Mr. Baber of a fair trial. We accordingly overrule this assignment of error.

F.

{¶41} Turning to his sixth assignment of error, Mr. Baber argues that his conviction was against the weight of the evidence. In reviewing whether the conviction runs counter to the manifest weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In other words, we review the evidence, the credibility of witnesses, and the entire record. *Id.* But we will only reverse if the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶42}** Mr. Baber's manifest weight challenge is primarily one of credibility—he highlights the evidence related to Mr. Killings and his presumptive motive to steer the focus away from himself. Relatedly, Mr. Baber seizes on the fact that another witness who saw him on the date of the shooting reported that he was wearing a t-shirt and not a blue and orange hoodie, and he plays up inconsistent descriptions by the 911 callers. However, "it is well settled law that matters as to the credibility of witnesses are for the trier of fact to resolve." *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 21. " 'When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29, quoting *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17.

**{¶43}** To be sure, Mr. Killings had credibility concerns, and such matters were appropriately vetted at trial. But we fail to see how these concerns undermine the integrity of the verdict, when considered in the context of the entire record. And with respect to the clothing discrepancies, the fact that a witness spotted Mr. Baber at some point on the date of the shooting without a hoodie is hardly revelatory—he could have simply removed the hoodie. Finally, regarding the inconsistent accounts by the 911 callers, these were certainly important points for the defense that were explored at trial. Simply because some evidence supports the defense theory does not transform a conviction into a manifest weight violation.

**{¶44}** Based on the evidence as we have surveyed it above, we do not have any concerns that the jury lost its way and created a manifest injustice. Therefore, we overrule the sixth assignment of error.

### G.

{¶45} In his final assignment of error, Mr. Baber attacks the trial court's decision to apply the violent offender registration requirement embodied in R.C. 2903.41 et seq. (Sierah's Law) against him. Mr. Baber argues that this registration requirement runs afoul of the Retroactivity Clause of the Ohio Constitution, which prohibits ex post facto laws, because it applies to acts committed before the effective date of the statute. *See* Article II, Section 28, Ohio Constitution ("The general assembly shall have no power to pass retroactive laws * * * .").

{¶46} As relevant here, the statute contains a "presum[ption] that the violent offender shall be required to enroll in the violent offender database with respect to the offense." R.C. 2903.42(A)(1). And assuming the trial court follows that presumption, the offender must personally enroll annually with the sheriff of his or her county of residence. R.C. 2903.43(B), (D)(1). That enrollment process includes providing required information, such as aliases, addresses, social security number, driver's license number, the offense prompting the registration, the name and address of any school the offender is attending, employer information, license plate numbers of each vehicle, and a description of scars or tattoos. *Id.* at (C)(2).

{¶47} Ohio courts are split on whether this registration scheme is substantive (thus violating the Retroactivity Clause) or remedial. *See State v. Hubbard*, 2020-Ohio-856, 146 N.E.3d 593, ¶ 32 (12th Dist.) ("[W]e find that Sierah's Law is remedial, rather than substantive, in nature."); *State v. Jarvis*, 2020-Ohio-1127, 152 N.E.3d 1225, ¶ 36 (5th Dist.) ("[W]e conclude that * * * R.C. 2903.41, et seq. * * * violates Section 28, Article II of the Ohio Constitution, which prohibits the General Assembly from passing retroactive laws.").

21

We also note that the Ohio Supreme Court has certified a conflict to decide this very issue. *See State v. Jarvis*, 159 Ohio St.3d 1427, 2020-Ohio-3473, 148 N.E.3d 568.

{¶48} Nonetheless, we have previously determined that Sierah's Law is remedial in nature and not violative of the Retroactivity Clause. *See State v. Rike*, 1st Dist. Hamilton No. C-190401, 2020-Ohio-4690, ¶ 62 (holding that Sierah's Law is " 'not so punitive that [it] impose[s] a new burden in the constitutional sense, as contemplated by [*State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108],' and, instead, [is] remedial in nature."), quoting *Hubbard* at ¶ 37. We decline to revisit that holding here, and we accordingly overrule Mr. Baber's final assignment of error.

*     *     *

{¶49} In light of the foregoing analysis, we overrule Mr. Baber's seven assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**CROUSE, J.,** concurs.
**WINKLER, J.,** concurs in judgment only.

Please note:

The court has recorded its entry on the date of the release of this opinion