[Cite as *State v. White*, 2024-Ohio-2426.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230354 |
| | | TRIAL NO. B-2101059 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| DAVID WHITE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 26, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}     Following a jury trial, defendant-appellant David White was convicted of one count of complicity to the murder of Dontez Hollis under R.C. 2903.02 and 2923.03(A)(2).  He now appeals that conviction, asserting five assignments of error.  We overrule his assignments of error and affirm the trial court's judgment.

### I. Factual Background

{¶2}     On January 24, 2021, at approximately 11:30 a.m., Cincinnati police officers responded to a report of shots fired at an apartment complex located at 1788 Grand Avenue.  Upon arrival, emergency responders found Hollis lying face-up in the parking lot of the complex.  He appeared to have suffered numerous gunshot wounds.  Though life-saving measures were performed, he died of his injuries at the scene.

### A.  The Scene of the Crime

{¶3}     That morning, Kimberly Taylor was visiting her boyfriend in his apartment at 1794 Grand Avenue.  That building shared a parking lot with three other buildings in the complex, including the 1788 building where Hollis's body was found.  She heard gunshots and went to the window to see what had happened.  By the time she got to the window, the gunshots had stopped.  She saw a body lying on the ground and a person running through the grass, who got into the back driver's side of a car.

{¶4}     Taylor described the car as newer and bright red with tinted windows.  She said it also had a large black V-shaped design on the rear of the car and a circular emblem in the middle of it.  The car then left the parking lot and turned right on Grand Avenue.  She called 911.  When asked what type of car it was, she said it was a red four-door Chevrolet or Toyota.  When questioned by police, she said it had a "regular" license plate, not a temporary tag.

{¶5}   Deseri Albright lived in an apartment on the third floor of the building at 1788 Grand Avenue.  After hearing four or five gunshots, she went to the window.  She saw a man standing in the grass shooting at another man who was in the parking lot by a car.  She said that the shooter had a hat and a mask that covered his face.  She also said that the shooter shot the victim in the back, and after the victim slumped down, he shot about seven more times.  Then the shooter jumped into the back of a red or maroon car.  The car then "took off," left the parking lot and turned right onto Grand Avenue.  She called 911.  She later told the police that the car was a maroon four-door sedan with tinted windows.  She could not identify the make or model.

{¶6}   Steven Wagner lived in a house at 1848 Grand Avenue near the apartment complex.  He heard several gunshots.  When he looked out the window, he saw a red car with black tinted windows "fly by."  When asked about the kind of car, he said, "They're all the same to me, maybe a Monte Carlo or a Charger, or something like that."  A video from the front-facing camera that Wagner had at his house showed a red car going down Grand Avenue.  Wagner said it was "booking," going way over the speed limit.  He gave a copy of the video to the police.

{¶7}   The eyewitnesses could only provide generic descriptions of the shooter, and no one saw the driver of the car due to the tinted windows.  The police did not have any names for the suspects.  They provided screenshots of the red car from the surveillance footage and told officers to be on the lookout for that car.

### B.  A Previous Shooting

{¶8}   Officer Jerry Turner was assigned to the investigative unit and investigated shootings and robberies. He testified that he was familiar with White because White had been shot on November 20, 2020, and he was assigned to

investigate that shooting. He interviewed White a few days after White had gone into surgery.

{¶9} White told him that he saw someone he knew by the name of "Think," which was Hollis's nickname, and stopped to talk with him. Hollis was with another individual that White did not know. That person asked White for a ride, but White said no. He attempted to get in White's car but it was locked. Then, that person pulled out a gun and shot White through a partially rolled-down window. The unknown person and Hollis took off running, and White went to the hospital.

{¶10} Officer Turner considered Hollis a witness, not a suspect. He interviewed Hollis, who was mostly uncooperative. White told Officer Turner that he believed that Hollis had "set him up." White became uncooperative after he left the hospital. Turner had a few sparse conversations with him and eventually lost contact with him.

### C. The Police Investigation

{¶11} Detective Brandon Fields and his partner were the lead detectives investigating Hollis's murder. Detective Fields learned from a Bureau of Motor Vehicles ("BMV") investigator that White owned a red four-door sedan. The BMV investigation led Detective Fields to the owner of Trans Auto Car Sales. He learned that White had bought a red Lincoln MKZ two days before the murder, which was later confirmed by White's texts and photos. Detective Fields compared the information obtained from Trans Auto with the surveillance video and determined that the car in the video matched White's red Lincoln.

{¶12} The police obtained a warrant to search White's residence at 610 Cheviot Road. They recovered a temporary tag for a 2013 Lincoln listing White as the

purchaser of the vehicle. The tag had an issue date of January 22, 2021, two days before the shooting. A Lincoln with the same VIN was found in the parking lot. It had a car title designating White as the owner of the car. By the time that the warrant was executed, approximately a month after the murder, the car had been painted gray on the outside, but the interior surfaces were still red.

{¶13} The police found a cell phone during the search. They were able to extract information from that phone and identified White's phone number. Detective Fields entered that number into the Securus system, the call system for inmates at the jail, to search outbound calls from the Hamilton County Justice Center. He found five calls from various inmates to White's number between November 7, 2020, and January 29, 2021. He testified that he recognized White's voice on each of those calls from his interview with White. He indicated that White's voice was distinctive because it was higher pitched than the other voices on the calls.

{¶14} Four of those calls occurred before the murder. In them, White talked about buying a new car and trailing a person called "Think" or "Little Think," both of which were Hollis's nicknames. The day before the murder, the speakers on the call discussed a "purge," which Detective Fields interpreted as meaning to go on a mission or to hunt something.

{¶15} The fifth call occurred a few days after the murder. Detective Fields stated that multiple individuals on the call spoke in a "celebratory fashion." They spoke about "hang[ing] a rat by his tail." They also talked about "smoking a pack," which Fields indicated was a phrase that was used when someone was killed. White stated, "I smoke hella little short joint, little dummy," which Detective Fields believed was a reference to Hollis, who was "small in stature, a very short person."

### II. Prosecutorial Misconduct

**{¶16}** In his first assignment of error, White contends that the state engaged in prosecutorial misconduct when it improperly referenced facts not in evidence and misrepresented the facts during closing argument. This assignment of error is not well taken.

**{¶17}** Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162, 694 N.E.2d 932 (1998); *State v. Wallace*, 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 65. The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *Wallace* at ¶ 65. The conduct of the prosecuting attorney cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Wallace* at ¶ 65.

**{¶18}** The state presented evidence of the phone calls made to White's cell number from inmates at the jail. It also presented the testimony of Captain Kyran Weithofer, the support services supervisor of the Jail Services Division of the Hamilton County Sheriff's Office, to explain the call system for the inmates. Defense counsel asked him during cross-examination, "When somebody is calling from the jail it will show up on a cell record or cell phone as the same number regardless of where it comes from in the jail?" He responded that that statement was correct. Counsel then asked if that number was (513) 572-3375, he replied, "I believe that's it. I'm not entirely familiar with it, yes * * *."

**{¶19}** At trial, White argued that he was not a party to the calls from the jail. After the state rested its case, the defense presented Exhibit 56, a certified copy of

White's cellphone records, as the sole evidence in its case-in-chief to rebut the state's claim that the calls from the jail were to him and to show that the phone number that Captain Weithofer had testified about was not in those records.

{¶20} In its closing arguments, the state referenced the calls from the jail, and in response, White argued that his cell phone records showed that he had not received any calls from the number (513) 572-3375 on the days the state had argued that the phone calls had occurred. Thus, he contended that Detective Fields was wrong in identifying White as one of the voices on the call.

{¶21} In rebuttal, the state argued that the number (866) 718-4777 was in White's phone records and that number corresponded to the date of each of the five calls referred to by the state. The state noted that that number was from Securus, and it matched the dates of the jail calls. Defense counsel objected, arguing that the state referred to matters not in evidence. The state responded that that number was in White's phone records and corresponded with each of the five calls.

{¶22} We need not address the merits of White's arguments because even if the remarks were improper in any way, they did not deny White a fair trial. First, the trial court instructed the jury that closing arguments of counsel are not evidence and the jurors are the sole judges of the facts. *See State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 119. A jury is presumed to follow the trial court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994); *State v. Baber*, 2021-Ohio-1506, 171 N.E.3d 1257, ¶ 26 (1st Dist.).

{¶23} Further, White contends that he was prejudiced because the prosecutor's remarks bolstered the credibility of the state's evidence about the jail calls, which was the only evidence linking him to the murder. White portrays the state's evidence as weak, but the record does not support that claim. The evidence

regarding White's car, White's previous shooting, and the jail calls allowed the jury to find that White was guilty of complicity to the murder.

**{¶24}** White also contends that the phone records categorically refuted the state's evidence about the calls. But the state presented a Securus report, which showed that the calls were made from the jail to White's phone number. Further, the jury apparently believed Detective Fields's testimony that he recognized White's voice and gave the phone records their due weight. The trier of fact may believe some, all, or none of any witness's testimony. *State v. Williams*, 1st Dist. Hamilton Nos. C-060631 and C-060668, 2007-Ohio-5577, ¶ 37. Under the circumstances, we overrule White's first assignment of error.

### III. Speedy Trial

**{¶25}** In his second assignment of error, White contends that the trial court erred in denying his motion to dismiss. He argues that the state's delay in bringing him to trial violated his right to a speedy trial. This assignment of error is not well taken.

**{¶26}** Our review of speedy-trial issues involves mixed questions of fact and law. *State v. Cheatham*, 1st Dist. Hamilton No. C-200142, 2021-Ohio-2495, ¶ 8. We give due weight to the inferences drawn from the facts found by the trial court as long as they are supported by competent, credible evidence. We review the trial court's conclusions of law de novo to determine whether the facts satisfy the applicable legal standard. *State v. Gage*, 2018-Ohio-480, 104 N.E.3d 994, ¶ 5 (1st Dist.).

**{¶27}** Ohio has codified defendants' rights to speedy trials in R.C. 2945.71. *Cheatham* at ¶ 11. Under R.C. 2945.71(C)(2), a person charged with a felony must be tried within 270 days from his arrest. Each day that a defendant is held in jail in lieu

of bail is counted as three days. R.C. 2945.71(E). Therefore, in felony cases, the state must try a jailed defendant within 90 days from his arrest. *Id.*

**{¶28}** Because White has shown that he was not tried within 90 days of his arrest, he established a prima facie violation of the speedy-trial statutes. *See Gage* at ¶ 7. The state bears the burden to show that actions or events chargeable to the defendant have tolled enough time so that the defendant was tried within the speedy-trial period. *Id.*

**{¶29}** Extensions of the time period within which the state must try the accused are permissible only for the reasons expressed in R.C. 2945.72. *State v. Saffell*, 35 Ohio St.3d 90, 91, 518 N.E.2d 934 (1988); *Gage*, 2018-Ohio-480, 104 N.E.3d 994, at ¶ 8. Those reasons include "any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused," the period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than on the accused's own motion. R.C. 2945.72(E) and (H).

**{¶30}** White was arrested on February 25, 2021, and the time began to run the following day. *State v. Covington*, 1st Dist. Hamilton No. C-190731, 2021-Ohio-2907, ¶ 8; *Gage* at ¶ 9. At the hearing on White's motion to dismiss, the parties stipulated that the time between White's arrest and the time that White's initial discovery request was filed on March 23, 2021, was 26 days that were chargeable to the state. The parties also stipulated that White waived time from March 24, 2021, to August 15, 2022.

**{¶31}** White filed a motion in limine on February 18, 2022, and a motion to suppress on June 9, 2022. Both of those motions were filed during the period that he had waived time. On August 16, 2022, the court journalized an entry continuing the matter until September 14, 2022, at the state's request. The entry stated that the reason

was a "family emergency" and that the time was tolled under R.C. 2945.72(H), which tolls the time for any period of any reasonable continuance granted other than upon the accused's own motion. The entry also stated that White did not waive time.

{¶32} Under R.C. 2945.72(H), the record must show that the continuance was reasonable. *State v. Downing*, 1st Dist. Hamilton Nos. C-130319 and C-130320, 2014-Ohio-4029, ¶ 7. A continuance due to the unavailability of the prosecutor is reasonable under R.C. 2945.72(H) as long as it is necessary. *See State v. Watson*, 10th Dist. Franklin No. 13AP-148, 2013-Ohio-5603 (illness of prosecutor); *State v. Williamson*, 5th Dist. Licking No. 2005 CA 00046, 2005-Ohio-6198 (death in prosecutor's family). Therefore, the time until September 14, 2022, was tolled.

{¶33} On September 14, 2022, the state requested a one-day continuance to the next day, September 15, 2022, for the hearing on the motion to suppress. White did not waive time. That day was chargeable to the state, making 27 days chargeable to the state.

{¶34} On September 15, 2022, the court journalized an entry granting a continuance until November 1, 2022, at the request of both counsel. It stated, "Motion to suppress hearing 10/20/22 * * * (Time tolled from 6/9/22 to Motion Hearing date 10/22/22.)." The entry also stated that White did not waive time, which is irrelevant given that his counsel joined in the motion for a continuance.

{¶35} A continuance granted upon the parties' joint motion tolls time under R.C. 2945.72(H) because the motion is made, in part, by the defendant. Joint motions for a continuance toll a defendant's speedy-trial time because they can be attributed to both parties. *Watson* at ¶ 19; *State v. Canty*, 7th Dist. Mahoning No. 08-MA-156, 2009-Ohio-6161, ¶ 83. Therefore, time was tolled until November 1, 2022. Even if the time from October 20, 2022, the date of the hearing on the motion to suppress, until

November 1, 2022, the date the court announced its decision on the motion, was chargeable to the state, 13 days elapsed, for a total of 40 days.

**{¶36}** On November 1, 2022, the court held a hearing to announce that it had granted White's motion to suppress. At that hearing, one of the prosecutors stated that the case was set for trial that day, but his cocounsel was in another trial. The state moved for a continuance, to which White objected. The court stated it would grant a brief continuance. The parties agreed on a trial date of November 28, 2022. A prosecutor's unavailability for trial is a reasonable reason for a continuance under R.C. 2945.72(H). *State v. Crocker*, 2015-Ohio-2528, 38 N.E.3d 369, ¶ 58 (4th Dist.); *Watson*, 10th Dist. Franklin No. 13AP-148, 2013-Ohio-5603, at ¶ 20. Even assuming that the time was chargeable to the state, 27 days elapsed, making a total of 67 days.

**{¶37}** White concedes that he waived time between November 28, 2022, and January 3, 2023. On January 3, 2023, the court signed an entry granting a continuance at the state's request until January 23. It stated, "Defendant DOES NOT waive time. Defense counsel available January 3, 2023; First available trial date for the court. (Jan. 3, 2023, was plea or trial setting date previously set by defense.)"

**{¶38}** The state argues that during that time period the defendant never requested that the case be set for trial. But the Ohio Supreme Court and this court have held that the state has a mandatory duty to comply with the speedy-trial statutes. The accused's failure to object to a trial date outside the applicable time limit does not amount to acquiescence to that date and does not extend the time within which the state must try the accused. *State v. Cutcher*, 56 Ohio St.2d 383, 384-385, 384 N.E.2d 275 (1978); *State v. Matthews*, 1st Dist. Hamilton Nos. C-060669 and C-060692, 2007-Ohio-4881, ¶ 26.

**{¶39}** Nevertheless, the court's November 28, 2022 entry stated, "Defendant waives time until next jury trial date." The trial began on January 23, 2023. Therefore, the time between January 3 and January 23 was chargeable to White. Even if it was not, 20 days would be chargeable to the state, making a total of 87 days.

**{¶40}** In sum, considering the time tolled or waived, White was tried within the 90-day period set forth in R.C. 2945.71. Consequently, we overrule his second assignment of error.

### IV. Evidentiary/Trial Issues

**{¶41}** In his third assignment of error, White contends that the trial court erred when ruling on his objections to evidence at trial. The decision whether to admit or exclude evidence lies within the trial court's discretion. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. An appellate court will not disturb a trial court's decision admitting or excluding evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985); *State v. Williams*, 1st Dist. Hamilton No. C-180291, 2020-Ohio-1228, ¶ 32.

**{¶42}** First, White contends that the trial court erred in admitting photos from the search of his residence at 6310 Cheviot Road without proper authentication. Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Put another way, "[t]he authentication requirement is satisfied when the proponent presents foundational evidence or testimony from which a rational jury may determine that the evidence is what its proponent claims it to be." *State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 29 (1st Dist.).

{¶43} This court has stated that "[t]his burden is not great, and only requires a prima facie showing through direct or circumstantial evidence." *Id.* Photographic evidence is admissible "when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on the witness' personal observation." *State v. Thyot*, 1st Dist. Hamilton Nos. C-170178 and C-170179, 2018-Ohio-644, ¶ 19, quoting *Midland Steel Prod. Co. v. Internatl. Union, U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991).

{¶44} Criminalist Brad Smith took photos of the Lincoln found in the parking lot of White's residence when the police executed the search warrant. On redirect examination, Criminalist Smith recalled that a temporary tag registration was recovered from the apartment search, but testified that he did not process that scene. Over defense objection, he was permitted to testify as to the contents recovered from the apartment despite his earlier statement that he did not process that scene.

{¶45} The state recalled Criminalist Smith, who testified that he and his partner photographed the Lincoln, and the exterior and interior of the apartment, including the temporary tag located in a kitchen drawer. The defense objection was based on Smith's testimony that he recalled seeing the tag recovered but he did not process it. He clarified that he had processed the entire scene with his partner.

{¶46} White argues that Smith's partner collected the items and Smith testified that he was merely present. He contends that even if his testimony was believed, Smith's simply being present was insufficient to show personal knowledge of the items photographed and collected from the scene. White mischaracterizes Smith's testimony. He stated that he and his partner process the scene of a crime together. One recovers the items, while one takes photographs. Smith took the photographs that day and saw the evidence recovered. His testimony was sufficient to authenticate the photos. *See State v. Rosemond*, 2019-Ohio-5356, 150 N.E.3d 563, ¶ 58 (1st Dist.).

13

**{¶47}** Next, he argues that the trial court erred in not instructing the jury to disregard the prosecutor's closing remarks as to facts not in evidence. His arguments under this assignment of error are simply a rehash of his arguments under his first assignment of error. Before the closing arguments, the court instructed the jury that closing arguments are not evidence, and White never requested a more specific instruction, so he forfeited the issue. *See* Crim.R. 30(A); *State v. Jones*, 2018-Ohio-4754, 124 N.E.3d 439, ¶ 45 (1st Dist.).

**{¶48}** Finally, White argues that the trial court erred in allowing the jury to use a listening aid when the jail calls were played without reviewing the aid for material differences. White challenged the accuracy of the transcripts of the calls, arguing that they contained numerous "indiscernible statements," and that it was unfair to suggest to the jury what they were going to hear. The court said that the transcripts could be used as listening aids, but they would not be admitted into evidence. The court instructed the jury that the evidence is the audio of the actual calls, not the transcripts.

**{¶49}** We don't have the transcripts. It appears they were never proffered, so we cannot determine whether there were any material differences between the calls and the transcripts. *See State v. Urso*, 195 Ohio App.3d 665, 2011-Ohio-4702, 962 N.E.2d 689, ¶ 79-80 (11th Dist.). Though White objected to the use of the transcripts, he never requested the court to review the transcripts.

**{¶50}** Further, White thoroughly cross-examined Detective Fields about his interpretations of the calls and his identification of the speakers. Detective Fields acknowledged one discrepancy during White's cross-examination. Ultimately, it was up to the jury to determine the accuracy of his testimony based on its evaluation of the audio of the calls. Consequently, we overrule White's third assignment of error.

### V. Cumulative Error

{¶51}   In his fourth assignment of error, White contends he was deprived of his constitutional right to a fair trial due to the cumulative effect of numerous trial court errors that affected the outcome of the trial.  He argues that a reasonable probability exists that the cumulative effect of the numerous errors by the trial court affected the outcome of the trial.  This assignment of error is not well taken.

{¶52}   The cumulative effect of errors may deprive a defendant of a fair trial even though individual instances of error do not warrant a reversal. The defendant must demonstrate that a reasonable probability exists that the outcome of the trial would have been different absent the alleged errors.  *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Bell*, 2015-Ohio-1711, 34 N.E.3d 405, ¶ 49 (1st Dist.).

{¶53} White is simply rearguing the same issues he has already raised in his previous assignments of error, which we have held to be without merit.  None of those alleged errors, either separately or together, affected the fairness of the trial.  Though the evidence of White's guilt was circumstantial, circumstantial and direct evidence have the same probative value.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus; *State v. Armstead*, 1st Dist. Hamilton No. C-200417, 2021-Ohio-4000, ¶ 12.  Consequently, we overrule White's fourth assignment of error.

### VI. Weight and Sufficiency

{¶54} In his fifth assignment of error, he argues that the evidence was insufficient to support his convictions.  He argues that the state failed to prove that he aided and abetted with the same criminal intent as the principal offender.  He also argues that his conviction was against the manifest weight of the evidence because the

evidence did not credibly support his involvement in the murder. This assignment of error is not well taken.

{¶55} R.C. 2923.03(A)(2) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id and abet another in committing the offense." To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. The intent may be inferred from the circumstances surrounding the crime. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus; *In re J.C.*, 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 15. To aid and abet is to assist or facilitate the commission of a crime or to promote its accomplishment. *Johnson* at syllabus; *In re J.C.* at ¶ 14.

{¶56} Mere presence of an individual at the scene of the crime is not sufficient to prove that he or she was an accomplice. *Johnson* at 245; *In re J.C.* at ¶ 15. But the state may show aiding and abetting by direct or circumstantial evidence. It can be inferred from "presence, companionship, and conduct before and after the offense is committed." *Johnson* at 245; *In re J.C.* at ¶ 15. Driving a getaway car is sufficient to establish aiding and abetting. *State v. Ward*, 1st Dist. Hamilton No. C-210655, 2022-Ohio-3899, ¶ 11; *State v. Duke*, 6th Dist. Wood No. WD-20-001, 2021-Ohio-1552, ¶ 25.

{¶57} White argues that no evidence linked him to the getaway car, and his cell phone records showed he was not involved with the calls from the jail. We disagree. The state's evidence showed that White blamed Hollis for his own shooting in November 2020. On the jail calls where White's voice was identified by Detective Fields, White is heard discussing purchasing a new car and trailing a person called

"Think." In the fourth call, he is heard discussing a "purge," which Detective Fields interpreted as going on a mission or a hunt. The next day, Hollis was murdered and the shooter fled the scene in a red four-door sedan. White had purchased a red four-door sedan two days before the murder, which he later painted gray. Days after the murder White was heard celebrating the shooting.

{¶58} There was substantial evidence from which the jury could reasonably infer that White participated in the crime and shared the intent of the principal offender. White is essentially arguing that his evidence was more credible, but in deciding if the evidence is sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses. *Bell*, 2015-Ohio-1711, 34 N.E.3d 405, at ¶ 57.

{¶59} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution could have found that the state proved beyond a reasonable doubt all of the elements of complicity to murder. Therefore, the evidence was sufficient to support the conviction. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29.

{¶60} White also argues that his conviction was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Wallace*, 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 69.

{¶61} Again, White argues that the state's evidence was not credible, but matters as to the credibility of evidence are for the trier of fact to decide. *State v.*

*Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Wallace* at ¶ 70. we overrule White's fifth assignment of error.

**{¶62}** In sum, we find no error prejudicial to White that denied him a fair trial. Consequently, we overrule his five assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, J.,** concurs.
**BOCK, P.J.,** concurs separately.

**BOCK, P.J.,** concurring separately.

**{¶63}** I agree with the majority's resolution of White's assignments of error. I write separately, however, to explain that under White's second assignment of error, I believe that White's act of waiving time on November 28, 2022, "until the next trial date" did not constitute an open-ended waiver of time in light of his subsequent refusal to waive time.

**{¶64}** A defendant "may validly waive the speedy trial provisions of R.C. 2945.71 et seq" if the waiver is knowingly and intelligently made. *State v. O'Brien*, 34 Ohio St.3d 7, 9, 516 N.E.2d 218 (1987). A defendant's open-ended waiver of time tolls the speedy-trial clock until the defendant "files a formal written objection to any further continuances and makes a demand for trial." *Id.* Once the defendant withdraws the waiver, the state must bring the defendant to trial within a reasonable time. *Id.*; *see State v. Brown*, 9th Dist. Lorain No. 21CA011739, 2023-Ohio-2909, ¶ 8. ("If an accused succeeds in withdrawing his unlimited waiver, 'the strict requirements of R.C. 2945.71 [are] no longer applicable.' ").

**{¶65}** *O'Brien* acknowledges a defendant's right to waive speedy-trial rights but prevents the state from abusing the defendant's waiver by unreasonably delaying

a trial. Of course, under *O'Brien*, the defendant must affirmatively act to withdraw a waiver. I believe that White did just that in the trial court's January 3, 2023 entry, in which White expressly stated that he was no longer waiving time.

**{¶66}** Moreover, White's waiver was not so "open-ended" as to waive time until the court actually held the trial. White agreed to waive time "until the next trial date." But after that waiver, the trial court scheduled two "plea or trial settings." And during the January 3, 2023 plea or trial setting, he expressly refused to waive time following the state's request for a continuance.

**{¶67}** Given the requirement that we strictly construe R.C. 2945.71 against the state, White's express statement that he was no longer waiving time put the state and the trial court on notice that White needed to be tried.

**{¶68}** I concur in the majority's opinion because the period between White's waiver on January 3, 2023, and the trial on January 23, 2023, was a reasonable time under *O'Brien* and because even if we counted the time after January 3, 2023, against the state, the state still would have tried White within the statutory time.

**{¶69}** Accordingly, I respectfully separately concur in the majority's opinion.

Please note:
  The court has recorded its own entry this date.